[No. S085193. Jan. 20, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
BERNARD ALBERT NELSON, Defendant and Appellant.

200

202

---

**COUNSEL**

Glen Niemy, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Keith H. Borjon, John R. Gorey and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**CORRIGAN, J.**—A jury convicted defendant Bernard Albert Nelson of the first degree murder, robbery, and attempted carjacking of Richard Dunbar. It concluded, as a special circumstance, that the murder was committed in the course of the other two felonies. It also convicted him of robbing, inflicting great bodily injury upon, and attempting to murder Miguel Cortez. In addition, it found defendant guilty of attempting to murder Giovanni Boccanfuso, Charles Coleman, and "John Doe." It found that Boccanfuso and Coleman were peace officers engaged in the performance of their duties when attacked, and that defendant personally used a firearm during the crimes. Defendant was sentenced to death.

This appeal is automatic. We affirm the judgment.

## I. FACTUAL BACKGROUND

A. *Guilt Phase*

1. *Murder, Robbery and Attempted Carjacking of Richard Dunbar*

a. *Prosecution evidence*

On the night of April 5, 1995, Richard Dunbar was murdered in front of the West Palms apartment complex on Alvern Street in Los Angeles. Christie Hervey heard the gunshots and told her son to call 911. From her balcony, she saw a man lying in the street, crying for help. Another man walked swiftly toward Hervey, coming within 40 feet of her.[1] He carried a gun and looked over his shoulder at the victim. The area was brightly lit; Hervey's view of the gunman was unobstructed. Two years later police showed Hervey six photographs. She picked defendant's photograph as that of the gunman. She identified defendant at the preliminary hearing and again, positively, at trial.

Lacourier Davis, a security guard, also heard the shots. He saw a man sitting on the ground with his back against a car, and blood flowing from a hole in his chest. The victim was identified as Mr. Dunbar by his sister and his roommate. He died of two fatal gunshot wounds, one passing through his lung and the other puncturing his aorta.

His roommate testified that Dunbar took his car keys when he left their Inglewood Avenue apartment that evening. While his new BMW was found

---

[1] As we will explain, Hervey's distance from the gunman was disputed by the defense.

at the crime scene, the keys were missing. Dunbar's other personal effects, including his driver's license, were found at the scene.

Guilt was established by defendant's admissions and by ballistics evidence connecting several events.

On a single night nine months before the murder, defendant and Frank Lewis committed a series of robberies. Lewis was 14 years old; defendant was an adult. Defendant gave Lewis a gun and drove around Hollywood looking for victims. He waited in the car while Lewis accosted the targets. One intended victim sprayed Mace at Lewis, who ran away. Defendant responded by slapping his young confederate. When the pair saw Lisa La Pierre in her parked car, defendant directed Lewis to steal her phone. Wanting to prove himself, Lewis shot La Pierre, then returned the gun to defendant. A .380-caliber cartridge casing was found at the crime scene. Ms. La Pierre survived the shooting.[2] When Lewis testified at defendant's trial he was serving a California Youth Authority (now Division of Juvenile Justice) term for the attempted murder.

Seventeen months after the Dunbar murder, Los Angeles police responded to a report of gunshots at 9700 Glasgow Place. They encountered several members of the MoneySide Hustlers gang. One of the men fled, dropping a .380-caliber pistol. A ballistics expert testified that this discarded gun fired the cartridge casings recovered at the Dunbar and La Pierre crime scenes.

Glenn Johnson was one of the gang members at Glasgow Place. When police interviewed him after the incident, Johnson was out of custody, friendly, and cooperative. He told Detective Ronald Cade that defendant said he was "trying to carjack somebody and they wouldn't cooperate so he killed him." Defendant gave the location of the killing as the West Palms apartment complex where Dunbar was murdered. Johnson saw defendant drop a .380-caliber pistol when he ran from Glasgow Place. Sometime before the Glasgow Place incident, defendant had loaned the gun to Johnson and told him to "be careful, there was some murders on the gun."

Detective Cade told Johnson he might receive reward money, and later gave him $100. Cade did not intercede for Johnson on any cases. At trial,

---

[2] The attempted murder of Lisa La Pierre was not one of the crimes charged against defendant in the guilt phase of this proceeding. Instead, it was one of defendant's other violent crimes adduced at the penalty phase in aggravation of punishment. (Pen. Code, § 190.3, factor (b). All further statutory references are to the Penal Code unless otherwise indicated.) However, the prosecution offered this testimony of Lewis at the guilt phase, in order to further tie defendant to the Dunbar murder weapon.

Johnson either denied, or said he could not recall, making the statements to Cade. Excerpts of the tape-recorded interviews were admitted as prior inconsistent statements.

### b. *Defense evidence*

Dr. Scott Fraser testified as a defense expert witness on eyewitness identification. According to Dr. Fraser, studies have shown that a number of factors affect one's ability to recognize faces. The following were among the factors he addressed.

*Distance.* There was conflicting evidence as to how close Ms. Hervey was to the gunman. She estimated 40 feet. Dr. Fraser's later measurements at the scene suggested 100 feet. Measurements taken by Detective Cade, who testified on rebuttal, suggested 75 feet. Measurements taken by a defense investigator, who testified on surrebuttal, were consistent with those of Dr. Fraser. The distance was significant because, according to Dr. Fraser, the ability to recognize even familiar faces "drops down to essentially nil" beyond 80 feet. For strange faces, "recognition accuracy drops off dramatically" beyond 50 feet.

*Kinetic distortions.* According to Dr. Fraser, it is difficult to maintain focus on a moving object: "[W]e jerk and jump ahead in order to try to keep up with it. And in those transitions of keeping up with it, there's no fixation. So less information is stored." Hervey testified that defendant walked swiftly toward her while looking back at his victim.

*Weapons focus.* A weapon tends to distract attention. Hervey testified defendant was carrying a gun.

*Time.* Memory degrades over time; Hervey was first shown the photo lineup two years after the murder.

### 2. *The Attempted Murder of Miguel Cortez*

On the night of August 16, 1995, security guard Miguel Cortez was stationed at a fence enclosing two Hollywood nightclubs. He was grabbed from behind, but managed to get a look at his assailant's face. He identified defendant as the man who shot him four times, in the eye, cheek, stomach, and hand. Multiple surgeries were required to treat those injuries. Defendant took Mr. Cortez's pistol, a nine-millimeter Beretta, and his beeper, saying, "I took your shit." Mr. Cortez identified defendant's photo from a group of six men. He also identified defendant at a preliminary hearing and at trial. A ballistics expert testified that the .380-caliber bullets and cartridge casings

found at the scene of the Cortez shooting were fired by the pistol that defendant dropped at Glasgow Place, to the "exclusion of all others."

In addition to being identified by Mr. Cortez, defendant made incriminating statements to Leonard Washington, a convicted bank robber. Defendant said he had shot someone to obtain a nine-millimeter Beretta and commit a bank robbery. Washington testified: "He told me in the exact words he had to gun somebody down to get it." Defendant said he believed he "killed the guy."

Washington told Detective Cade that defendant had loaned him the nine-millimeter, which Washington used in a driveby shooting. After the shooting, Washington abandoned the car, and the pistol was found by the Inglewood police. When Washington admitted this, defendant replied, "No big deal, I smoked a security guard to get the gun."

### 3. *Attempted Murders of Police Officers and "John Doe"*

Shortly after midnight on May 7, 1997, uniformed Los Angeles Police Officers Charles Coleman and Giovanni Boccanfuso were on patrol in a marked police car. They saw a Chevrolet Monte Carlo roll through a stop sign and pick up speed. Stolen cars were common in the vicinity, and Monte Carlos, in particular, were a frequent target. The officers pursued the Monte Carlo to check the license plate and determine whether it had been reported stolen.

As the Monte Carlo and trailing patrol car approached an intersection, a Jeep pulled away from the curb and drove through the intersection with its headlights off. Officer Coleman was concerned because "this was fairly typical behavior of somebody who is about to do a drive-by shooting." However, it was the passenger in the Monte Carlo who did the shooting. He climbed out onto the open window frame, braced his arms on the roof, and aimed a pistol at the driver of the Jeep.[3] Then, instead of firing at the Jeep, he pointed the pistol at the patrol car and fired four to six shots at the officers.

The Monte Carlo sped away with the patrol car in pursuit. When the Monte Carlo swerved at an intersection, defendant jumped or fell out, with a pistol in his hand. He tumbled three or four times and the gun slid across the pavement. Officer Boccanfuso chased him on foot, closing to within three feet of him, when defendant turned around. He pointed another pistol at the officer, but dropped it. An expended shell casing stuck in the chamber of this pistol prevented it from being fired. Defendant scaled a 10-foot wall and

---

[3] The identity of the Jeep driver was unknown. He was referred to in the attempted murder count as "John Doe."

eluded Boccanfuso. He was caught an hour later at the registered address of the abandoned Monte Carlo. He had fresh abrasions on his elbows and one knee.

At trial, the officers identified defendant as the gunman. According to Officer Boccanfuso, they were no more than a car's length from defendant when he shot at them, nothing obscured his face, and the intersection was well lit by street lights. Officer Coleman testified, "I got a good look at him [when] he shot at us." Moreover, as Officer Boccanfuso chased defendant on foot, he saw his face again several times, for a total of perhaps 10 seconds, as defendant looked back during the pursuit. Boccanfuso also "star[ed] right at his face" when defendant stopped within three feet and pointed the gun at him.

### B. *Penalty Phase*

#### 1. *Prosecution Evidence*

##### a. *Victim impact evidence*

Victim impact evidence was given by Richard Dunbar's mother, father, sister, two brothers, and sister-in-law. Their testimony was brief and relatively subdued. Together they described Dunbar as an attractive young man on the cusp of a successful acting and modeling career, a son and brother to whom they were close and whom they sorely missed. His murder changed their lives "tremendously" and "dramatically."

##### b. *Evidence of defendant's other violent crimes*

###### i. *Attempted murder of Lisa La Pierre*

Frank Lewis essentially repeated his guilt phase testimony regarding defendant's responsibility for the shooting of Ms. La Pierre. (See *ante*, pt. I.A.1.a.)

Ms. La Pierre testified that she was sitting in her parked car, talking on her cell phone. The next thing she knew she woke up in a hospital. A gunshot to her neck left her permanently paralyzed from the shoulders down, unable to breathe on her own, and unable to live without the assistance of others.

###### ii. *Bank robberies*

As he did with Frank Lewis, defendant used a juvenile, Leonard Washington, to commit a series of armed robberies, this time of banks.

Each time defendant waited in the car. According to Washington, on December 17, 1996, defendant, Washington, and a third man robbed Topa Savings Bank and Great Western Bank. The total taken in the two robberies was approximately $9,000. A teller from the Topa Savings Bank testified that $2,500 to $3,000 was taken from him at gunpoint.

When he testified, Washington was incarcerated for these crimes, having been apprehended during a third bank robbery. He was bitter at defendant for abandoning him at the scene as the police closed in, and for failing to get him a lawyer.[4]

### 2. *Defense Evidence*

Defendant's mother, Barbara Nelson, testified that defendant's father physically abused him. She also admitted neglecting him emotionally. Mrs. Nelson married at seventeen. When defendant was an infant, the family lived in a trailer next to her parents in Batesville, Mississippi. Her husband often slapped, choked, and kicked her. To keep defendant from crying, Mr. Nelson stuffed cotton into his mouth and taped his lips shut. He also pushed defendant's head underwater when Mrs. Nelson was bathing him. If Mrs. Nelson's family responded to her screams, Mr. Nelson would hold defendant up by his feet and threaten to drop him if they came closer. When defendant was two years old, the family moved to Mr. Nelson's home, British Honduras. There, according to Mrs. Nelson, "the abuse got ten times worse."

Next, the family moved to Roswell, New Mexico. There Mrs. Nelson was hospitalized for an appendix that ruptured when Mr. Nelson beat her. When Mr. Nelson brought defendant and his two-year-old brother James to visit her, Mrs. Nelson could see that James had been slapped so hard he had a handprint on his face. James died from a blood clot in his brain, but Mrs. Nelson did not inform the police of the abuse. After his death, Mrs. Nelson became so depressed that she was mute for months at a time. Because she was too depressed to talk to him, defendant "had to try to deal with life [himself]."

Although Mrs. Nelson left her husband and moved to Milwaukee, they eventually reunited and had another son, Brian. When Mr. Nelson stuffed cotton into Brian's mouth, a babysitter called the police. Mrs. Nelson obtained a restraining order against her husband and moved in with her sister's family. That Christmas Mr. Nelson sat outside the sister's house with

---

[4] It was stipulated that defendant was also convicted of Vehicle Code violations and received probationary sentences. In one of those cases defendant nearly hit three other cars as he fled from police officers during a high-speed chase. (See Veh. Code, § 2800.2.)

a gun, threatening to kill all of them. The next month he killed himself. Mrs. Nelson had another abusive marriage that ended in divorce.

Because defendant was bullied in Los Angeles, Mrs. Nelson sent him home to Mississippi to complete high school. Mrs. Nelson, a hospital secretary, encouraged defendant to become a phlebotomist, which he did. Defendant had a daughter, Ania, for whom he cared while her mother worked.

Mrs. Nelson loved defendant and regretted that her chronic depression had prevented her from better caring for her children.

Defendant's aunt, cousin, and half brother also testified in his behalf. Eunice Edwards, Mrs. Nelson's sister, lived next door when defendant was an infant. Two or three times a week she witnessed Mr. Nelson's abuse of Mrs. Nelson and defendant. When Ms. Edwards divorced and needed work, defendant convinced her to become a phlebotomist, too. Ms. Edwards loved defendant very much. Tiffany Edwards, Eunice's daughter, was close to defendant growing up. When she became pregnant at the age of 15, defendant brought her food. Defendant was close to his own daughter and frequently also provided child care for Tiffany's son. Defendant helped Ascia McCullen, his half brother, with his schoolwork and encouraged him to become a good student. Ascia loved defendant.

Psychologist Richard Romanoff testified as an expert defense witness. He met with defendant's mother and aunt, reviewed defendant's file, administered various tests, and interviewed defendant for 10 hours.

Dr. Romanoff testified that defendant was "very bright" and well understood society's norms. He found no evidence of organic impairment or acute psychiatric illness. However, he did diagnose defendant as suffering from an antisocial personality disorder. According to Dr. Romanoff, this disorder "affects a person's ability to take account of the rights and feelings of others." It manifests itself in manipulative behavior, poor anger management, superficial social relationships, and criminality. The disorder is thought to arise from failure to attach to one's primary caregivers during infancy and early childhood. In defendant's case, the likely genesis was his father's physical abuse and eventual suicide, as well as his mother's emotional absence. In Dr. Romanoff's opinion, defendant's antisocial personality disorder was compounded by alcohol abuse.

On cross-examination, Dr. Romanoff acknowledged that defendant's 1994 probation report indicated that he denied using alcohol or drugs, and that a 1997 probation report stated the probation officer had found no indication of such use. Dr. Romanoff also acknowledged that defendant told him he had a "pretty happy childhood."

## II. DISCUSSION

### A. *Guilt Phase Issues*

#### 1. *Sufficiency of the Evidence*

■ Defendant claims the evidence is insufficient to support his convictions for the Dunbar crimes and the special circumstance finding. He also attacks the evidentiary sufficiency for the attempted murder of "John Doe." The claims lack merit.[5]

"In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129 [40 Cal.Rptr.3d 118, 129 P.3d 321]; see *People v. Lindberg* (2008) 45 Cal.4th 1, 27 [82 Cal.Rptr.3d 323, 190 P.3d 664].)

#### a. *The crimes against Richard Dunbar*

##### i. *The murder*

Christie Hervey identified defendant as the gunman who walked swiftly toward her and who looked back at the body of Mr. Dunbar. (See *ante*, pt. I.A.1.a.) Defendant claims Ms. Hervey's testimony was insubstantial because she was 100 feet away, could have seen the man only briefly, had to

---

[5] Defendant casts these insufficiency of the evidence claims in constitutional terms, contending he was denied "his right to due process of the law, to a fair trial and to a reliable determination of guilt and penalty under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution." No separate constitutional discussion is required, or provided, when rejection of a claim on the merits necessarily leads to rejection of any constitutional theory or " 'gloss' " raised for the first time here. (*People v. Loker* (2008) 44 Cal.4th 691, 704, fn. 7 [80 Cal.Rptr.3d 630, 188 P.3d 580]; *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

study the photo lineup for 20 minutes before identifying defendant, and could not say whether the man had a mustache or beard. His argument fails. According to Ms. Hervey and Detective Cade, Ms. Hervey was 40 to 75 feet from the gunman. The scene was brightly lit and her view was unobstructed. (See *ante*, pt. I.A.1.a.) Ms. Hervey not only identified defendant in the photo lineup, but also at the preliminary hearing and again at trial. Moreover, defendant admitted to Glenn Johnson that he killed a man during a failed carjacking at the West Palms apartment complex, the scene of Dunbar's murder. Johnson saw him in possession of the pistol used to kill Dunbar. (*Ibid.*) Finally, the same pistol was used in the attempted murder of Miguel Cortez, and Mr. Cortez identified defendant as his attacker. (See *ante*, pt. I.A.2.)

### ii. *The robbery*

Defendant claims the evidence of robbery was insubstantial because no one saw him take Mr. Dunbar's car keys, he did not admit having taken them, and they were not discovered in his possession. However, there was substantial circumstantial evidence of the taking. Mr. Dunbar left his apartment with his keys and used them to drive to the murder scene. They were not found on his person or at the scene, although his other personal effects were. (See *ante*, pt. I.A.1.a.) We held substantially similar circumstantial evidence sufficient to support a robbery-murder special circumstance finding in *People v. Maury* (2003) 30 Cal.4th 342 [133 Cal.Rptr.2d 561, 68 P.3d 1]. The victim was last seen in Maury's company. She had a roll of cash and announced her intention to buy marijuana with it. However, neither money nor drugs were found when her body was later discovered. We concluded "the jury could reasonably infer" that Maury had "stole[n] either the money or marijuana from [her]." (*Id.* at p. 402.)

### iii. *The attempted carjacking*

Defendant claims the evidence of attempted carjacking was insubstantial. He argues "it was far more likely than not that there was no intent or attempt to take the vehicle, as the victim was incapacitated and nothing prevented the assailant from taking the victim's car." To the contrary, the jury was entitled to conclude that defendant, having taken Mr. Dunbar's car keys, would have taken the car itself, but that the gunshots drew the security guard to the scene and may have prompted neighbors to call the police, as Ms. Hervey did. (See *ante*, pt. I.A.1.a.) Defendant himself told Glenn Johnson that he killed a man at the West Palms complex because he resisted an attempted carjacking. Further, the gun defendant later abandoned was conclusively linked to the murder through ballistics evidence. (*Ibid.*)

#### iv. *Special circumstance*

■ As with the underlying crimes, substantial evidence supported the special circumstance finding that the murder occurred in the commission of robbery or attempted carjacking. "From evidence that a defendant killed another person and at the time of the killing took substantial property from that person, a jury ordinarily may reasonably infer that the defendant killed the victim to accomplish the taking and thus committed the offense of robbery. (*People v. Hughes* (2002) 27 Cal.4th 287, 357 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Kipp* [(2001)] 26 Cal.4th [1100,] 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887].)" (*People v. Bolden* (2002) 29 Cal.4th 515, 553 [127 Cal.Rptr.2d 802, 58 P.3d 931] [special circumstance finding supported by substantial evidence].)

#### b. *The attempted murder of "John Doe"*

#### i. *Specific intent*

■ "Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (Pen. Code, § 21a; *People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].)" (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 7 [58 Cal.Rptr.3d 421, 157 P.3d 1017].)

Defendant contends there was insufficient evidence that he intended to kill "John Doe," the driver of the Jeep.

■ When Doe drove through the intersection, defendant pulled himself up onto the window frame on the passenger side of his car, braced his arms on the roof, and aimed at Doe. He changed his target only when he noticed the patrol car and shot at the officers, instead. (See *ante,* pt. I.A.3.) The evidence supported the jury's conclusion that defendant intended to kill the officers. Defendant does not challenge those convictions here. The evidence is also compelling that defendant aimed at Doe intending to kill him. Indeed, at trial defense counsel argued that defendant was shooting at Doe, not at the officers. Simply pointing his gun at Doe under these circumstances is sufficient to support a finding of attempted murder. As we noted in *People v. Dillon* (1983) 34 Cal.3d 441, 455 [194 Cal.Rptr. 390, 668 P.2d 697], "the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized." Also instructive is our decision in *People v. Ervine* (2009) 47 Cal.4th 745 [102 Cal.Rptr.3d 786, 220 P.3d 820]. In *Ervine* we concluded that sufficient evidence supported a conviction for attempting to murder a third police officer, because the

evidence indicated that the defendant wanted to kill all the officers at the scene but had "undertaken a direct but ineffectual act toward accomplishing the intended killing by firing . . . at the [two] officers who posed the most immediate threat." (*Id.* at p. 786.) In the present case, as in *Ervine*, it appeared that defendant was first trying to eliminate the threat posed by the police officers who were pursuing him, before returning his attention to Doe, the attempted murder victim.

### ii. *Premeditation*

Defendant contends the evidence was also insufficient to support the jury's verdict that the attempted murder of Doe was premeditated and deliberate.

■ An intentional killing is premeditated and deliberate if it occurred as the result of reflection rather than unconsidered or rash impulse. (*People v. Stitely* (2005) 35 Cal.4th 514, 543 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *People v. Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) However, the requisite reflection need not span a specific or extended period of time. Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly. (*People v. Harris* (2008) 43 Cal.4th 1269, 1286–1287 [78 Cal.Rptr.3d 295, 185 P.3d 727] (*Harris*); *People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335].) A conviction will be upheld on any reasonable theory supported by substantial evidence. (*People v. Manriquez* (2005) 37 Cal.4th 547, 577 [36 Cal.Rptr.3d 340, 123 P.3d 614]; *People v. Hughes, supra*, 27 Cal.4th at p. 370.)

Defendant clearly formed an intent to kill and took several steps to achieve that end. He took up a firearm, climbed out of a moving car, sat on the window frame, reached across the roof, braced himself, and aimed at Doe. He had ample time to premeditate and deliberate. (See *Harris, supra*, 43 Cal.4th at p. 1287.)

### 2. *Consciousness of Guilt*

Defendant contends the trial court erred by admitting a handwritten "script" giving defendant an alibi for the attempted murders of Doe and the officers. Detective Mark Campbell impounded a Jeep from defendant's girlfriend, "Cher."[6] The Jeep was registered to "Terry James." Robert Cross, who lived at the Jeep's registered address, told Campbell that "Terry James" was defendant.[7] Campbell found a backpack in the Jeep. It contained the

---

[6] "Cher" did not testify.

[7] Defendant was also known as "Jaye," a name used in the script.

script, other handwritten notes, and a notebook with rap lyrics. On cross-examination, Campbell admitted that the script and the other notes did not appear to be in the same handwriting as the lyrics. As noted in part II.B.4., *post*, defendant's authorship of the rap lyrics was undisputed. The script was read into the record.[8]

While the prosecutor did not expressly say so, he apparently offered the script to prove that defendant had tried to fabricate an alibi, thereby manifesting a consciousness of his guilt. Defendant objected to the script on the ground it was not in his handwriting. The court overruled the objection, noting that it was found among his possessions.

■ An attempt to fabricate evidence may manifest a defendant's consciousness of guilt, but only if the attempt was made by the defendant or by another with the defendant's knowledge or authorization.[9] (*People v. Bell* (2004) 118 Cal.App.4th 249, 256 [12 Cal.Rptr.3d 808]; *People v. Caruso* (1959) 174 Cal.App.2d 624, 640–641 [345 P.2d 282]; *People v. Perez* (1959) 169 Cal.App.2d 473, 477 [337 P.2d 539].)

Defendant claims there was no evidence that he "had anything to do with" the script, which he notes was dated May 22, 1997. Because he had been arrested two weeks earlier, he could not have placed the script in the backpack. The backpack and car had been accessible to others after his arrest.

Assuming that admission of the script was error, the error was clearly harmless. Evidence that defendant tried to fabricate an alibi for the incident

---

[8] "Statements for Jaye Bernard Nelson. Court.

"May 22, 1997, Thursday.

"Anthony (Tone): Jaye came over to the house on Monday, May 5th, and asked if he could spend a couple nights at the house because he was sleeping in cars. Jaye offered to help with working on cars, and said he knew some people that needed some car service. You told Jaye he could stay there, but he needed to get his act together.

"Jaye spent the night Monday. Tuesday he helped with cars all day, and his friend Perry stopped by to get an oil change at 1:00 p.m., but you and Jaye were busy with another car. So Jaye told him to try back that night or tomorrow morning. Perry said okay and left. Jaye was wearing gray sweat pants and a white T-shirt. The T-shirt was dirty from working on cars.

"Tuesday night, May 6, Jaye left on foot going to the store at about 10:40 p.m. with the same sweat pants and dirty T-shirt. The next time you saw Jaye was about 30 to 40 minutes about 11:15 to 11:20 p.m. getting out of a blue compact-sized car with one male individual, the driver, the same car that had come by for an oil change earlier.

"You, Kendall noticed cuts and abrasions on Jaye's arms as he approached the house. You and Kendall told him to go to the back room and lay down, and he did. The next time you saw him he was in his underclothes."

[9] Consciousness of guilt may be shown by (1) a defendant's own efforts to create false evidence or obtain false testimony, or (2) the efforts of someone else to do so, "but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions." (CALCRIM No. 371.)

involving the officers and John Doe turned out to be entirely superfluous. Defendant admitted he was the shooter. In arguing for the exclusion of the rap lyrics, as discussed below, defense counsel represented to the court that "we're not saying somebody else shot the police officers, shot at police officers, or shot at the car." "I am going to argue, frankly, the shooting was not directly at the police officers, and it had nothing to do with the fact that they were police officers." In his guilt phase argument to the jury, defense counsel admitted that defendant was at the scene and was the shooter, although he denied that defendant was attempting to murder the police officers.[10] Moreover, following admission of the script, the parties did not refer to it again, except during closing argument. There, defense counsel argued the script was prepared by defendant's girlfriend, and the prosecutor characterized this argument as pure speculation because the girlfriend did not testify. The prosecutor did not argue to the jury that the script showed defendant's consciousness of guilt.[11]

### 3. *Instructions on Lesser Related Offenses*

With regard to the attempted murders of Officers Boccanfuso and Coleman, the court declined defendant's request to instruct on assault with a deadly weapon (§ 245) and negligent discharge of a firearm (§ 246.3) as lesser offenses. In *People v. Birks* (1998) 19 Cal.4th 108 [77 Cal.Rptr.2d 848, 960 P.2d 1073], this court overruled its holding in *People v. Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303] that a defendant's unilateral request for a related-offense instruction must be honored over the prosecution's objection. (*Birks*, at p. 136; see *People v. Rundle* (2008) 43 Cal.4th 76, 146–147 [74 Cal.Rptr.3d 454, 180 P.3d 224]; *People v. Yeoman* (2003) 31 Cal.4th 93, 129 [2 Cal.Rptr.3d 186, 72 P.3d·1166].) Defendant admits that assault with a deadly weapon and negligent discharge of a firearm are not lesser included offenses of attempted murder, but rather lesser related offenses. Thus, under *Birks*, the court did not err. We have previously rejected an argument that the *Birks* rule violates the federal Constitution. (*Rundle, supra,* 43 Cal.4th at pp. 147–148.)

---

[10] "Now, we know it's Nelson. He's got the abrasions. He's got the gun. He's got the connection to it. It's him."

"[W]e know where Mr. Nelson was . . . . Right? The issue on this particular case was, A, was he shooting at Police Officers, Coleman and Boccanfuso? [¶] [I]f you look at the evidence, no, he was shooting at the jeep."

[11] Neither party requested a consciousness of guilt instruction. The question was not so openly and closely connected to the facts of this case as to fall under the general requirement for a sua sponte instruction. (See *People v. Roldan* (2005) 35 Cal.4th 646, 715 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Carter* (2003) 30 Cal.4th 1166, 1219 [135 Cal.Rptr.2d 553, 70 P.3d 981]; *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903].)

#### 4. *Instructions on Circumstantial Evidence*

Defendant contends that the standard instructions on circumstantial evidence, which use the phrase "appears to you to be reasonable," undermine the constitutional requirements of proof beyond a reasonable doubt. "We have repeatedly rejected the argument and continue to do so. (*People v. Maury, supra*, 30 Cal.4th at p. 428.)" (*People v. Horning* (2004) 34 Cal.4th 871, 910 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

#### B. *Penalty Phase Issues*

#### 1. *Voir Dire Regarding Penalty Deliberations*

During voir dire the court examined the willingness of potential jurors to impose the death penalty if the aggravating circumstances were so substantial in comparison with the mitigating circumstances that they concluded death was warranted. However, in querying individual jurors, the court used a shorthand expression: "the bad outweighs the good." For example, the court asked: "If the bad outweighs the good, can you see yourself actually voting for death? Prospective Juror No. 11: Yes. The Court: If the bad outweighs the good, can you see yourself nevertheless voting for life? Prospective Juror No. 11: Yes." The defense never objected to the shorthand usage, or asked for further elaboration on the point during jury selection.

Defendant now contends these colloquies amounted to "de facto instructions" that were prejudicially defective in two respects: (1) The word "good" misleadingly suggested that only positive behavior on the part of the defendant might be considered as a mitigating circumstance; and (2) the shorthand expression also failed to inform jurors that in order to return a verdict of death, each of them would have to be persuaded that the aggravating circumstances were *so substantial* in comparison with the mitigating factors that death was warranted, instead of life without possibility of parole.

Neither claim is meritorious. The court covered both of these points when it initially explained the law to the jury before conducting voir dire. "At the penalty phase we deal with different kinds of evidence, mitigation and aggravation, good things, to make it simple, versus the bad things." The court clarified that "good" was not limited to "good deeds," but rather included "background" factors, such as a "tough childhood" or "brain damage," that might "explain" the defendant's conduct and help the jury "decide what the appropriate penalty is." It repeatedly emphasized that rendering a death verdict would be appropriate only if the jurors concluded that the aggravating factors "substantially" outweighed the mitigating factors.

Both points were covered again in formal instructions before the penalty deliberations. The jury was specifically told: "A mitigating circumstance is

any fact, condition or event which does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are *so substantial* in comparison with the mitigating circumstances that it warrants death instead of life without parole."

■ We have repeatedly upheld the pattern jury instruction[12] used by the court in its formal instructions. (See, e.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1249 [96 Cal.Rptr.3d 574, 210 P.3d 1171] (*Bramit*).) The jury was properly instructed, and the court explained its shorthand usage. It is not required that every utterance by the court be so formulaic as to constantly repeat cumbersome phrases or unduly consume time. A party concerned about lack of clarity may certainly interpose an objection. None was made here. Finally, there is no indication that the jury was actually misled.

### 2. Corroboration of Aggravating Evidence

■ Section 190.3, factor (b) provides that in determining whether to impose the death penalty or life without possibility of parole, the trier of fact may take into consideration the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

The evidence of defendant's prior violent acts included his involvement with Frank Lewis in the attempted murder of Lisa La Pierre[13] and with Leonard Washington in two bank robberies.[14]

Defendant contends it was error to admit Lewis's and Washington's testimony because it was not corroborated.

■ Section 1111 prohibits a defendant from being convicted on the uncorroborated testimony of an accomplice. The section provides that accomplice testimony must be corroborated by "such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The accomplice corroboration requirement applies to the penalty phase as well. (*People v. Hernandez* (2003) 30 Cal.4th 835, 873–874 [134 Cal.Rptr.2d

---

[12] CALJIC No. 8.88; see CALCRIM Nos. 763, 766.

[13] See *ante*, part I.B.1.b.i.

[14] See *ante*, part I.B.1.b.ii.

602, 69 P.3d 446]; *People v. McDermott* (2002) 28 Cal.4th 946, 1000 [123 Cal.Rptr.2d 654, 51 P.3d 874] (*McDermott*); *People v. Mincey* (1992) 2 Cal.4th 408, 461 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

The corroborating evidence may be slight and entitled to little consideration when standing alone. However, it must tend to implicate the defendant by relating to an act that is an element of the crime. It need not by itself establish every element, but must, without aid from the accomplice's testimony, tend to connect the defendant with the offense. The trier of fact's determination on the issue of corroboration is binding on review unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime. (*People v. Abilez* (2007) 41 Cal.4th 472, 505 [61 Cal.Rptr.3d 526, 161 P.3d 58]; *McDermott, supra*, 28 Cal.4th at p. 986.)

Lewis's testimony was adequately corroborated by other evidence connecting defendant with the attempted murder of Lisa La Pierre. One of the expended cartridge casings found at the La Pierre crime scene was fired by the .380-caliber pistol defendant dropped at Glasgow Place. Detective Cade related statements made by Glenn Johnson. Johnson said that defendant admitted he dropped the pistol and ran from the police. Defendant had earlier given him the same pistol and warned him to be careful with it because "there was some murders on the gun." Referring to this evidence, defense counsel admitted in argument that Lewis's testimony was corroborated. "[Y]ou are left with some evidence, yeah, the gun. During the guilt phase, there is that evidence that came in that the gun that shot Miss La Pierre was the same .380 semiautomatic that was used in the other crimes. So there is some corroboration."

The Attorney General contends that Frank Lewis's testimony regarding defendant's involvement in the attempted murder of Lisa La Pierre served to corroborate Leonard Washington's testimony regarding defendant's involvement in the bank robberies, because defendant used the same "modus operandi" in all three instances, using teenagers to commit the crimes while he waited in the car.

We need not resolve this question. There is no reasonable possibility that defendant would have received a more favorable verdict had Washington not testified in the penalty phase.[15] The jury found beyond a reasonable doubt

---

[15] "State law error occurring during the penalty phase will be considered prejudicial when there is a *reasonable possibility* such an error affected a verdict. [Citations.] Our state *reasonable possibility* standard is the same, in substance and effect, as the *harmless beyond a reasonable doubt* standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1264, fn. 11 [131

that defendant committed one murder and four attempted murders. It is extremely unlikely that they had been ambivalent about the death penalty but were won over to that decision by relying on two robberies in which no one was injured.

### 3. *Victim Impact Evidence*

Defendant claims the trial court erred in overruling his objections to (a) childhood photographs of Richard Dunbar, (b) a written statement by Mr. Dunbar's friends, and (c) a photograph of Lisa La Pierre before the shooting.

### a. *The childhood photographs of Richard Dunbar*

As noted, six members of Mr. Dunbar's family testified about his murder's enduring impact. (See *ante*, pt. I.B.1.a.) In the course of their testimony, the jury was shown a poster board with five photographs of Mr. Dunbar as a child and one of him as an adult.[16]

 " 'Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a).' (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) 'The federal Constitution bars victim impact evidence only if it is "so unduly prejudicial" as to render the trial "fundamentally unfair." ' (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].)" (*Bramit, supra*, 46 Cal.4th at p. 1240.)[17]

The childhood photographs of Mr. Dunbar clearly satisfied this standard. We have cautioned trial courts about admitting victim impact videotape evidence, particularly if the presentation is lengthy or underscored with stirring music. (See, e.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1289 [57

---

Cal.Rptr.2d 468, 64 P.3d 762]; see *People v. Wallace* (2008) 44 Cal.4th 1032, 1092 [81 Cal.Rptr.3d 651, 189 P.3d 911]; *People v. Ashmus* (1991) 54 Cal.3d 932, 990 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

[16] The childhood photographs were portraits of Mr. Dunbar as a first grader and as a Cub Scout, as well as three family snapshots.

[17] Contrary to defendant's claim, victim impact evidence is not limited to circumstances known or foreseeable to the defendant at the time of the crime. (*Bramit, supra*, 46 Cal.4th at p. 1240; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

Cal.Rptr.3d 543, 156 P.3d 1015] (*Prince*).)[18] However, the few childhood photographs displayed here do not raise those concerns. As the trial judge observed in overruling defendant's objection to them, "I don't see those [photographs] as being anything that particularly pulls at somebody's heart strings." Instead, they simply " 'humanized' the victim, 'as victim impact evidence is designed to do.' " (*Bramit, supra,* 46 Cal.4th at p. 1241, quoting *People v. Kelly* (2007) 42 Cal.4th 763, 797 [68 Cal.Rptr.3d 531, 171 P.3d 548].)

### b. *The statement by Mr. Dunbar's friends*

A second poster board was an enlarged photograph of Mr. Dunbar as an adult. Superimposed on it was a statement written by two of his friends. According to his sister Christina, the statement was written as a eulogy for Mr. Dunbar's memorial service.[19]

At trial, defendant objected to the statement on the ground that its authors were "not going to be present" in court. The trial court overruled the objection, observing, "I'm not sure that's a valid objection." Defendant now contends the trial court erred because the statement was inadmissible hearsay. Alternatively, defendant contends the statement should have been excluded as unduly emotional. This is not à ground he assigned below.[20]

---

[18] In *Prince, supra,* 40 Cal.4th 1179, 1289, this court noted with approval the trial court's observation that " 'there is a qualitative difference between a videotape and a still photograph from an emotional standpoint.' "

[19] Entitled "Our Weekend with Alex Dunbar," the statement reads as follows:

"Very rarely in our lives do we meet people who touch us in some profound way, whether it is by their words, their actions, or just their being. We often wonder why these people come into our lives, what it is that they have to share with us, and how what they say affects us?

"We choose to remember Alex the way we saw him on Saturday, April 1, at Coley's Kitchen. As usual, he was well dressed and looking quite handsome. He was happy and full of life. His dynamic smile and enlightening personality lit the room as he made his way through the crowd. We each greeted Alex with a great big hug. We laughed, we talked, and we danced most of the night.

"As the evening came to a close, destiny guided us to Alex's apartment. All of us, including Alex's roommate, huddled and talked until dawn. We talked about so many things; life, love, relationships, goals and dreams. We even talked about the new apartment that he and Reese were moving into. There was such excitement in his voice as he gave us a guided tour and a brief description of how everything would be situated.

"After hours of talking and bonding, everyone began winding down, except Alex of course. He was still full of energy, telling one joke after the other until we were too exhausted to laugh. We were finally able to get about an hour's worth of sleep. As the sun filtered in, we realized a new day was breaking. It was already 10:30 a.m. We said our goodbyes as we exchanged hugs and kisses."

[20] "The Court: So your objection is that the writer is not here?" "[Defense counsel]: Yes, your honor."

Without explaining why, the Attorney General says he disagrees that the statement was inadmissible hearsay. He also claims defendant failed to perfect a hearsay objection below by clearly stating it.

Any error in admitting the statement was clearly harmless beyond a reasonable doubt. Six members of Mr. Dunbar's family testified to the lasting impact of his murder on them. They were close to him, proud of his achievements, and felt his loss keenly. The prosecutor did not refer to the statement of his friends in her penalty phase argument.

### c. *The photograph of Lisa La Pierre*

Defendant contends that the trial court erred in admitting a photograph of Lisa La Pierre as she appeared before the shooting paralyzed her. The photograph of Ms. La Pierre was not technically victim impact evidence, but rather aggravating evidence of defendant's other violent crimes. "[T]he circumstances of the uncharged violent criminal conduct, including its direct impact on the victim or victims of that conduct, are admissible under factor (b). (*People v. Holloway* (2004) 33 Cal.4th 96, 143 [14 Cal.Rptr.3d 212, 91 P.3d 164]; *People v. Mendoza* (2000) 24 Cal.4th 130, 185–186 [99 Cal.Rptr.2d 485, 6 P.3d 150].)" (*People v. Demetrulias* (2006) 39 Cal.4th 1, 39 [45 Cal.Rptr.3d 407, 137 P.3d 229].) The admission of such evidence "lies within the court's discretion. The jury is entitled to consider other criminal activity involving force or violence. (Pen. Code, § 190.3, factor (b).) As the trial court found, allowing the jury to know what the other murder victims looked like in life legitimately aided it in determining the appropriate punishment." (*People v. Carpenter* (1997) 15 Cal.4th 312, 401 [63 Cal.Rptr.2d 1, 935 P.2d 708].) The trial court here properly exercised its discretion, permitting the prosecution to introduce only one of the "myriad of photographs" it had of Ms. La Pierre before the shooting.

### 4. *Aggravating Evidence: Asserted* Boyd *Error*

Defendant contends the trial court erred in admitting his rap lyrics as aggravating evidence. Defendant's authorship of the lyrics was undisputed. They were found in a notebook in his Jeep and bore his name and a copyright

mark.[21] Defendant contends the lyrics, which speak in the first person about shooting police officers, should have been excluded as nonstatutory aggravating evidence. The Attorney General responds: (1) Defendant failed to object on this ground below; (2) the lyrics were properly admitted as aggravating evidence bearing on "the circumstances of the crime," his attempted murders of the police officers, under section 190.3, factor (a); and (3) any error in their admission was harmless.

 Evidence of a defendant's background, character, or conduct that is not probative of any specific sentencing factor is irrelevant to the prosecution's case in aggravation and therefore inadmissible. (*People v. Hawthorne* (2009) 46 Cal.4th 67, 92 [92 Cal.Rptr.3d 330, 205 P.3d 245]; *People v. Carter, supra*, 30 Cal.4th 1166, 1202; *People v. Boyd* (1985) 38 Cal.3d 762, 773–774 [215 Cal.Rptr. 1, 700 P.2d 782].)

"Aggravating evidence must pertain to the circumstances of the capital offense (§ 190.3, factor (a)), other violent criminal conduct by the defendant (*id.*, factor (b)) or prior felony convictions (*id.*, factor (c)); only these three factors, and the experiential or moral implications of the defendant's age (*id.*, factor (i)), are properly considered in aggravation of penalty. [Citations.] Evidence offered as rebuttal to defense evidence in mitigation, however, . . .

---

[21] In his opening brief, defendant reproduces the lyrics with his name as author and a copyright mark of 1991.

> "I'm pullin so many hoes I give my crew some
> Pistol whips any bitch that wanna get dumb
> I got so much money that it's crazy
> Now the IRS wanna fade me
> But I say fuck them cause I ain't the one to get played
> So make room for the youngsta
> I stepped to one of the cops that tried to play me
> Put the nine to his head (bam) rock a bye baby.

> "They had a gang sweep just the other day
> Cops rushed to the projects where I stay
> Sheriff's on my ass cause I tried to run
> Hopped a few fences and tossed my gun.
> I just barely got far enough to toss my gun
> Ran up an alleyway but they gave close chase
> If it wasn't for a fence I could've made my escape
> But I didn't and got rushed by about six
> All I could see was flashlights and night sticks
> And then I heard gunshots
> All of a sudden cops started to drop
> No time to waste I scooped up a nine
> I could take a hint. I guess it was time to get mine."

need not relate to any specific aggravating factor. [Citations.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108–109 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

The prosecution had sought to introduce the lyrics in the guilt phase. However, the court excluded them on the ground their probative value would be substantially outweighed by their prejudicial effect. (Evid. Code, § 352.)

In the penalty phase, the prosecution again moved to introduce the lyrics in its case-in-chief. The court informed counsel it was inclined to admit them. Defense counsel objected, saying "it's nothing but lyrics basically. And it could be interpreted very prejudicially . . . ." He added: "Most of those things were written years ago and doesn't necessarily mean any of this was planned." The objection was overruled.

Defendant now claims the lyrics "should have been excluded in that they were not relevant to any of the factors in aggravation listed in Penal Code section 190.3." The Attorney General contends that defendant failed to object on this ground in the trial court. Defendant responds: "[T]rial counsel made a clumsily phrased objection. However, the nature of the objection was such that both the court and prosecutor were adequately noticed of its legal grounds."

 "Under California law, error in admitting evidence may not be the basis for reversing a judgment or setting aside a verdict unless 'an objection to or a motion to exclude or to strike the evidence . . . was timely made and *so stated as to make clear the specific ground of the objection or motion . . . .*' (Evid. Code, § 353, subd. (a), italics added.) 'In accordance with this statute, we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. [Citations.]' (*People v. Seijas* (2005) 36 Cal.4th 291, 302 [30 Cal.Rptr.3d 493, 114 P.3d 742].) Although no 'particular form of objection' is required, the objection must 'fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.' ([*People v.*] *Partida* [(2005)] 37 Cal.4th [428,] 435 [35 Cal.Rptr.3d 644, 122 P.3d 765].)" (*People v. Zamudio* (2008) 43 Cal.4th 327, 354 [75 Cal.Rptr.3d 289, 181 P.3d 105].)

Here the court did make " 'a fully informed ruling' " on the ground defendant now asserts, that the lyrics "were not relevant to any of the factors in aggravation listed in Penal Code section 190.3." In the course of overruling defendant's objection, it explained: "It seems to me it's relevant to the

circumstances of the crime. It goes to the state of mind, his attitude towards the police, his attitude toward crime, attitude toward carrying weapons. Even if it was written in 1991, they were updated, and I think he was carrying them currently. [¶] Weighing them under 352, I think that the probative value . . . outweigh[s] the prejudice." Accordingly, we will review the ruling.

 Whether a defendant murdered without remorse "bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. [Citation.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1232 [275 Cal.Rptr. 729, 800 P.2d 1159]; accord, *People v. Ramos* (1997) 15 Cal.4th 1133, 1164 [64 Cal.Rptr.2d 892, 938 P.2d 950].) "Evidence that reflects directly on the defendant's state of mind contemporaneous with the capital murder is relevant under section 190.3, factor (a), as bearing on the circumstances of the crime. [Citations.]" (*People v. Guerra, supra*, 37 Cal.4th at p. 1154.) It bears repeating that it is evidence of the defendant's state of mind *at the time of the murder* that is admissible under factor (a). We have held that *postcrime* evidence of remorselessness, for example, does not fit within any statutory sentencing factor, and thus should not be urged as aggravating. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1184 [13 Cal.Rptr.3d 34, 89 P.3d 353]; *Gonzalez, supra*, 51 Cal.3d at p. 1232.)

The rap lyrics certainly express a remorseless attitude toward murder. Nevertheless, defendant contends they were inadmissible evidence of his state of mind for two reasons. First, lyrics are an art form. He urges that views expressed in a work of art are not necessarily those of the artist. Second, even if the lyrics expressed his views at the time he wrote them, they may have changed by the time of the murder. The existence of benign explanations does not stand as a bar to admissibility. In ruling on defendant's motion, the court would ordinarily consider alternative explanations in conducting an Evidence Code section 352 analysis. However, we need not resolve the admissibility question because there is no reasonable possibility that any error in admitting the lyrics was prejudicial. The jury found beyond a reasonable doubt that defendant had committed a murder and four attempted murders. The crimes were particularly distressing, with one victim shot in the eye, another permanently paralyzed, and two policemen attacked in the line of duty. The jury also learned that defendant repeatedly used juveniles as his agents to commit violent offenses. In light of this evidence, it strains credulity to suggest that the jury was improperly influenced by learning of defendant's foray into music publishing. Moreover, the prosecutor did not refer to the lyrics in her penalty phase argument.

### 5. *Cumulative Error*

Defendant contends the cumulative effect of guilt and penalty phase errors requires reversal of his death sentence. We disagree. To the extent we

concluded or assumed that the trial court erred, no single error warranted reversal, and we are not persuaded that reversal is warranted when those same nonprejudicial errors are considered collectively.

### 6. *Challenges to the Death Penalty Law and Instructions*

Defendant raises a series of challenges to California's death penalty law and the standard CALJIC sentencing instructions. We have rejected each of these challenges in the past and now reaffirm our holdings.

California's grant of discretion to prosecutors to decide in which cases to seek the death penalty is constitutional. (*People v. Gamache* (2010) 48 Cal.4th 347, 406 [106 Cal.Rptr.3d 771, 227 P.3d 342] (*Gamache*); *People v. Burney* (2009) 47 Cal.4th 203, 268 [97 Cal.Rptr.3d 348, 212 P.3d 639] (*Burney*); *People v. Brown* (2004) 33 Cal.4th 382, 403 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

Section 190.3, factor (a), which permits the jury to consider the circumstances of the crime in deciding whether to impose the death penalty, does not license the arbitrary and capricious imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. D'Arcy* (2010) 48 Cal.4th 257, 308 [106 Cal.Rptr.3d 459, 226 P.3d 949] (*D'Arcy*); *People v. Cruz* (2008) 44 Cal.4th 636, 680 [80 Cal.Rptr.3d 126, 187 P.3d 970] (*Cruz*).)

California homicide law and the special circumstances listed in section 190.2 adequately narrow the class of murderers eligible for the death penalty. (*Gamache, supra,* 48 Cal.4th at p. 406; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1058 [63 Cal.Rptr.3d 82, 162 P.3d 596] (*Barnwell*).) Specifically, the felony-murder special circumstance (§ 190.2, subd. (a)(17)) is not overbroad and adequately narrows the pool of those eligible for death. (*Gamache, supra,* 48 Cal.4th at p. 406; *People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation; agree unanimously that a particular aggravating circumstance exists; find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence; find that aggravation outweighs mitigation beyond a reasonable doubt; or conclude beyond a reasonable doubt that death is the appropriate penalty. (*Burney, supra,* 47 Cal.4th at pp. 267–268; *People v. Williams* (2008)

43 Cal.4th 584, 648–649 [75 Cal.Rptr.3d 691, 181 P.3d 1035].) This conclusion is not altered by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*), *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]. (*D'Arcy, supra,* 48 Cal.4th at p. 308; *People v. Carrington* (2009) 47 Cal.4th 145, 200 [97 Cal.Rptr.3d 117, 211 P.3d 617]; *People v. Mendoza* (2007) 42 Cal.4th 686, 707 [68 Cal.Rptr.3d 274, 171 P.3d 2].)

CALJIC Nos. 8.84.1 and 8.85, in directing the jury during the penalty phase to determine the facts from the evidence received during the entire trial, do not unconstitutionally allow the consideration of nonstatutory aggravating circumstances in the determination of penalty. (*People v. Ramirez* (2006) 39 Cal.4th 398, 474 [46 Cal.Rptr.3d 677, 139 P.3d 64]; *People v. Harris* (2005) 37 Cal.4th 310, 359 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Champion* (1995) 9 Cal.4th 879, 946 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

The trial court need not label the statutory sentencing factors as either aggravating or mitigating, nor instruct the jury that the absence of mitigating factors does not constitute aggravation. (*D'Arcy, supra,* 48 Cal.4th at p. 308; *People v. Watson* (2008) 43 Cal.4th 652, 704 [76 Cal.Rptr.3d 208, 182 P.3d 543]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1041 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

The use in the sentencing factors of the phrases "*extreme* mental or emotional disturbance" (§ 190.3, factor (d), italics added) and "*extreme* duress or . . . *substantial* domination of another" (*id.,* factor (g), italics added) does not inhibit the consideration of mitigating evidence or make the factors impermissibly vague. (*Bramit, supra,* 46 Cal.4th at p. 1249; *People v. Bunyard* (2009) 45 Cal.4th 836, 861 [89 Cal.Rptr.3d 264, 200 P.3d 879] (*Bunyard*); *People v. Lewis* (2008) 43 Cal.4th 415, 532 [75 Cal.Rptr.3d 588, 181 P.3d 947].)

The jury may properly consider unadjudicated criminal activity at the penalty phase and need not make a unanimous finding on each instance of such activity. (*D'Arcy, supra,* 48 Cal.4th at p. 308; *People v. Elliot* (2005) 37 Cal.4th 453, 488 [35 Cal.Rptr.3d 759, 122 P.3d 968]; *People v. Morrison* (2004) 34 Cal.4th 698, 729 [21 Cal.Rptr.3d 682, 101 P.3d 568].) *Apprendi* and its progeny do not compel a different result. (*D'Arcy,* at p. 308; *Bunyard, supra,* 45 Cal.4th at p. 861; *People v. Ward* (2005) 36 Cal.4th 186, 221–222 [30 Cal.Rptr.3d 464, 114 P.3d 717].)

Review for intercase proportionality is not constitutionally compelled. (*Pulley v. Harris* (1984) 465 U.S. 37, 42, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871]; *Bramit, supra,* 46 Cal.4th at p. 1250; *People v. Butler* (2009) 46 Cal.4th 847, 885 [95 Cal.Rptr.3d 376, 209 P.3d 596] (*Butler*).)

Because capital defendants are not similarly situated to noncapital defendants, California's death penalty law does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants but not to capital defendants. (*People v. Jennings* (2010) 50 Cal.4th 616, 690 [114 Cal.Rptr.3d 133, 237 P.3d 474]; *Cruz, supra,* 44 Cal.4th at p. 681; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (*People v. Mills* (2010) 48 Cal.4th 158, 215 [106 Cal.Rptr.3d 153, 226 P.3d 276]; *Butler, supra,* 46 Cal.4th at p. 885; *Barnwell, supra,* 41 Cal.4th at p. 1059.)

### 7. *Restitution Fine*

Pursuant to section 1202.4, the trial court imposed a $10,000 victim restitution fine. Defendant contends the court erred by failing to take into consideration his ability to pay. We find no error.

First, defendant forfeited this claim by failing to object at his sentencing hearing. (*Gamache, supra,* 48 Cal.4th at p. 409.) Unlike in *People v. Vieira* (2005) 35 Cal.4th 264 [25 Cal.Rptr.3d 337, 106 P.3d 990], defendant's claim does not depend on any subsequent statutory amendments. At the time of his 1995 crime and his 2000 sentencing, the law called for the court to consider a defendant's ability to pay in setting a restitution fine, and defendant could have objected at the time if he believed inadequate consideration was being given to this factor.[22] (*Gamache,* at p. 409.)

Second, defendant's claim fails on the merits. "He points to no evidence in the record supporting his inability to pay, beyond the bare fact of his impending incarceration. Nor does he identify anything in the record indicating the trial court breached its duty to consider his ability to pay; as the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor. Thus, we cannot say on this record that the trial court abused its discretion." (*Gamache, supra,* 48 Cal.4th at p. 409.)

---

[22] At the time of sentencing, as now, section 1202.4, subdivision (d), provided that in setting the amount of a restitution fine above the $200 minimum for a felony, the court should take into consideration, among other things, the defendant's "inability to pay."

## III. DISPOSITION

The judgment is affirmed.

Kennard, Acting C. J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and George, J.,[*] concurred.

---

[*]Retired Chief Justice of California, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.