Filed 4/11/13  P. v. Newton CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B239194 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA113818) |
| v. | |
| ARNOLD NEWTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Eleanor J. Hunter, Judge.  Affirmed.

Maxine Weksler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant Arnold Newton was convicted, following a jury trial, of one count of attempted murder in violation of Penal Code sections 187 and 664.[1] The jury found true the allegation that the attempted murder was willful, deliberate and premeditated. The jury also found true the allegations that appellant personally used a firearm within the meaning of section 12022.53, subdivisions (b), (c) and (d) and committed the crime for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(4). Appellant admitted that he had suffered a prior juvenile adjudication for a felony within the meaning of sections 667, subdivisions (b) through (i) and 1170.12 (the "Three Strikes" law). The trial court sentenced appellant to 15 years to life for the attempted murder conviction with the gang enhancement, doubled to 30 years to life pursuant to the Three Strikes law, plus a term of 25 years to life for the firearm enhancement, for a total of 55 years to life in state prison.

Appellant appeals from the judgment of conviction, contending that there is insufficient evidence to support the true findings on the gang allegation and the willful, deliberate and premeditated attempted murder allegation. He further contends that the trial court erred in denying his motion for disclosure of personal identifying information for the jurors. We affirm the judgment of conviction.

Facts

In the summer of 2010, Erika Jones lived in the Watts Arms Housing Complex with her young daughter. Erika's boyfriend, Dennis Hobson, stayed with her from time to time. Dominica Ealy and her daughter were also staying in the apartment. Appellant was the father of Dominica's child.

At the end of June or the beginning of July, someone broke several windows in Erika's residence. Erika believed that appellant was involved. Dominica gave Erika $250. They did not discuss the purpose of this payment. Erika believed that it was compensation for the broken windows. Dominica believed it was rent.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

As a result of the broken windows, Erika's landlord told her that he needed to inspect her residence. He reminded her that she was not allowed to have other people living with her.

On July 15, 2010, Erika told Dominica that Dominica needed to leave for a few days, until the inspection was over. Dominica said that she had just given Erika $250 and it would not be easy for her to leave. Erika insisted. Dominica walked out. Shortly thereafter, a friend of Erika's came in and said, "Dominica outside, talking mess."

Erika went outside and asked Dominica if there was a problem. Dominica said there was not. Erika and her daughter then walked toward the complex's playground. Appellant came up to Erika and told her that if she did not give the $250 back to Dominica, he would snatch the gold chain off her neck. They argued for a few minutes, then appellant walked away.

Soon, appellant returned and started arguing with Erika again. Hobson walked up to see what was happening. Appellant said he was angry because his "baby mama was getting put out." Hobson tried to calm appellant down and explain the situation. He was not successful. Four or five gunshots were fired, hitting Hobson. Hobson ran toward the apartments and appellant ran in the same direction.

Los Angeles Police Officer Ivan McMillan investigated the scene and canvassed the area for witnesses and evidence. He did not obtain any information.

Los Angeles Police Officer Tim Pearce interviewed Erika and Hobson after the shooting. Unbeknownst to Erika and Hobson, the interviews were recorded. The recordings were played at trial and transcripts were entered into evidence.

Erika told police that appellant was the shooter. She also told police that appellant said, "On Baby Loc Crip if you don't give my baby mama $250, it's gonna be a problem, woo, woo." She also said that appellant said, "I'm like on G-O and Grape Street, if you don't give my baby mama $250 there's gonna be problems." Erika understood these statements as "banging" on her and Hobson.

Hobson told police that appellant was the shooter and identified appellant in a six-pack photographic lineup. Hobson told police that he would not testify that appellant

3

shot him, however, as this "would make it all bad for [him]." He said he would rather run away than testify.

At trial, Erika said that she did not see anyone with a gun before, during or after the shooting. She denied telling police that appellant shot Hobson. She did not remember telling police that appellant made the above-quoted statements about his gang. She said that she could not hear most of what appellant and Hobson were arguing about. She said that she heard appellant say "On Baby Loc" and Hobson say "On Adams" during the argument.

At trial, Hobson said that he did not see who shot him, and did not tell police that appellant shot him. Hobson assumed he was shot because he was a gang member. He selected appellant from the lineup because appellant was present when the shooting occurred.

Officer McMillan testified at trial as a gang expert. He stated that appellant was an active member of the Grape Street gang. That gang's main territory ran through the Jordan Downs Housing Project, which included the Watts Arms complex where Erika lived. The primary activities of the gang were murder, attempted murder, witness intimidation, robberies, burglaries, grand theft and rape.

Officer McMillan explained that reputation is everything to a gang. A gang's reputation is based on and increased by violence. The resulting atmosphere of intimidation in the community makes it easier for the gang to carry out its criminal activities without fear of being caught or prosecuted.

Dominica testified on appellant's behalf at trial. She explained that she believed that the $250 she gave Erika was for rent. Dominica did not believe that she should have to move after making this payment. The two argued outside, in front of about 20 people. Appellant came up, joined the discussion and insisted that Erika return the money. Erika said that the money was for the repair of the broken windows. Appellant and Erika began to argue. Hobson joined the group, and began to argue with appellant. Dominica saw Hobson reach into his waistband for a gun handle. She ran away. As she ran, she heard gunshots. Dominica acknowledged that she did not mention Hobson's gun to police.

4

Discussion

1. Gang allegation

Appellant contends that there is insufficient evidence to support the jury's true finding on the gang allegation. He contends that the evidence shows only that the shooting arose from a family dispute and that he acted alone. Appellant concludes that the finding violates his state and federal constitutional rights to due process.

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citations.]'" (*People v. Nelson* (2011) 51 Cal.4th 198, 210.)

Section 186.22 requires that the defendant commit the charged crime for the benefit of, at the direction of or in association with, the gang and that he do so with the specific intent to promote, further or assist any criminal conduct by the gang. (*People v. Albillar* (2010) 51 Cal.4th 47, 51.) "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . gang enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048, quoting *People v. Albillar*, *supra*, 51 Cal.4th at p. 63.) "There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly

5

to see their purposes. We can discover mental state only from how people act and what they say.'" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.)

Appellant is correct that there is evidence that he was hot-headed and had a personal interest in Dominica getting her money back. That was not the only evidence before the jury, however. There was evidence showing that appellant interjected his gang membership into a dispute which began as a family matter. Erica told police that appellant said, "On Baby Loc Crip if you don't give my baby mama $250, it's gonna be a problem, woo, woo." She also said that appellant said, "I'm like on G-O and Grape Street, if you don't give my baby mama $250 there's gonna be problems." These statements can be reasonably understood as appellant using his gang membership to intimidate Hobson into paying. When the threats had no effect, appellant shot Hobson.

Officer McMillan explained that the reputation of a gang was "everything" to its members and mattered deeply to them. Reputation is increased through violent crime. Gang members "thrive on intimidation." Officer McMillan also explained that a gang's territory is very important to a gang, because it is an area that they control, where they commit most of their crimes.

It is reasonable to infer from this testimony that appellant shot Hobson to maintain his gang's reputation, or possibly to increase it, since Hobson was apparently not intimidated by appellant's verbal threat. This inference is reinforced by the fact that the incident took place outdoors in appellant's gang's territory, and in front of a number of witnesses.

As Officer McMillan explained, violent acts benefit a gang by increasing or maintaining its reputation for violence. This is sufficient to show a benefit to the gang. (*People v. Albillar, supra,* 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)."].)

As Officer McMillan also explained, a gang's reputation for violence makes it easier for the gang to get away with crimes with no "fear of ramifications" and will "deter

6

any kind of cooperation to law enforcement from witnesses or victims." This is sufficient to support an inference that appellant had the specific intent to promote or further other criminal conduct by his gang.

To the extent that appellant contends that the crime could not have been for the benefit of the gang because there is no indication in the record that anyone except Erika and Hobson were aware of appellant's gang affiliation, appellant is mistaken. According to Dominica, there were 20 or more people around when she and Erika were outside arguing. Appellant came and joined in this argument, and then Hobson did likewise. Then the shooting occurred. Erika told police that appellant stated his gang affiliation just before shooting Hobson. Thus, it is reasonable to infer that quite a few people heard appellant identify himself as a gang member. Further, as Officer McMillan's testimony showed, word spread in the community when a gang was responsible for crimes, even when the crimes were committed when no one was present, such as burglaries committed when the residents were out.[2]

To the extent that appellant relies on *People v. Ramon* (2009) 175 Cal.App.4th 843 and *In re Daniel C.* (2011) 195 Cal.App.4th 1350 to show insufficiency of the evidence, that reliance is misplaced. In those cases, the defendants did not identify themselves as gang members during their crimes. Appellant did identify himself as a member of Grape Street.

Since we have determined that "a rational trier of fact could have found the essential elements of the [enhancement] proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of article I, section 15, of the California Constitution." (*People v. Osband* (1996) 13 Cal.4th 622, 690.)

---

[2] Officer McMillan testified that about a year before trial there was a burglary problem in the housing projects, which involved Grape Street gang members breaking into residences when no one was home and taking televisions. Victims of these crimes and community members were intimidated and reluctant to speak with law enforcement.

2. Attempted murder

Appellant contends that there is insufficient evidence to support the jury's finding that the attempted murder was willful, deliberate and premeditated. He claims that the evidence shows only an impulsive shooting without any careful consideration or weighing of the consequences.

We review the sufficiency of the evidence in accordance with the standard set forth in *People v. Nelson, supra,* 51 Cal.4th at page 210, quoted in section 1, *ante*.

Generally, there are three categories of evidence to be considered in determining whether a murder was premeditated and deliberated: (1) planning activity; (2) motive and (3) manner of killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27.) These factors need not be present in any particular combination, and the categories are not exhaustive. (*People v. Pride* (1992) 3 Cal.4th 195, 247.) "'[W]hile premeditation and deliberation must result from "'careful thought and weighing of considerations'" [citation], we continue to apply the principle that "[t]he process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]"'" (*People v. Hughes* (2002) 27 Cal.4th 287, 370-371.)

Here, the evidence shows two interrelated motives for appellant to kill Hobson. Appellant wanted to get Dominica's money back, and he needed to uphold the reputation of his gang. Planning activity can be inferred from the systematic escalation of the confrontation between appellant and Hobson. Initially, there was a verbal argument. When no promise to return the money was forthcoming, appellant mentioned his gang and threatened Hobson with "problems" if the money was not returned. When this threat was not successful, appellant resorted to violence. The manner of the shooting supports an inference of premeditation and deliberation. Appellant shot Hobson at close range, in the chest. The chest, containing the heart, is a vulnerable area of the body. Nonetheless, Hobson was able to run away. Appellant then shot Hobson two more times, in the back and elbow. This continued shooting suggests a plan to kill Hobson, not simply scare him

or teach him a lesson or forcibly take the money from him. Viewed as a whole, the evidence is sufficient to support the jury's finding that appellant acted with premeditation and deliberation.

Even assuming for the sake of argument that the circumstances of the encounter could also be reconciled with a finding that appellant acted out of anger and without careful consideration, this would not warrant reversal of the judgment. (*People v. Nelson, supra,* 51 Cal.4th at p. 210 [if circumstances reasonably justify jury's findings, judgment may not be reversed simply because circumstances might also reasonably be reconciled with contrary finding].)

Since we have determined that "a rational trier of fact could have found the essential elements of the [allegation] proven beyond a reasonable doubt, the due process clause of the United States Constitution is satisfied [citation], as is the due process clause of article I, section 15, of the California Constitution." (*People v. Osband, supra,* 13 Cal.4th at p. 690.)

### 3. Juror information

Appellant made two attempts to raise his claim of juror misconduct. He filed a motion to release personal juror information, which was denied. He then filed a motion for a new trial based on juror misconduct, which included a renewed request for personal juror information. This motion was also denied. He claims that the trial court erred in denying both requests. We do not agree.

Generally, all juror identification information in a criminal trial is sealed after the verdict is recorded. (Code Civ. Proc., § 237, subd. (a)(2).) A petition for access to this information must be supported by "a declaration that includes facts sufficient to establish good cause for the release" of the information. (Code Civ. Proc., § 237, subd. (b).) If the petition and declaration "establish a prima facie showing of good cause," the trial court will set the matter for a hearing. (*Ibid.*) A trial court's refusal to hold a hearing on a request for disclosure of juror identifying information is reviewed for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317.)

9

Here, appellant claimed that he recognized Juror No. 4 during voir dire and told his counsel, but that his counsel did not act on the information. He made this claim in a post-verdict motion to relieve his counsel for ineffective assistance. A new counsel was appointed, and filed the motions requesting disclosure of Juror No. 4's personal information.

The first motion was a petition for disclosure of juror information to investigate potential juror misconduct. The accompanying declaration was signed by appellant's counsel and stated: "A) Defendant recognized Juror #4 from Youth Build Charter School where he attended and she worked. B) Juror #4 knew defendant and did not inform the Court. C) Juror #4 does not like the defendant and therefore was biased against him. D) Juror #4 became the Foreperson and was in a position to prejudice other jurors against the defendant."

The trial court ruled: "In this case, I'm going to find that the defense has not set forth a sufficient basis to disclose the juror identifying information. I think it is based on speculation and conjecture with regard to the proposed reasons, and I'm going to deny that."

We see no abuse of discretion in the trial court's ruling. Absent further details from appellant, it is not clear that appellant did actually know Juror No. 4. When questioned about her employment during voir dire, Juror No. 4 stated that she was a case manager for a non-profit in Watts.[3] Thus, there is no direct evidence that Juror No. 4 ever worked at the Youth Build Charter School. Juror No. 4 may simply have looked like someone appellant knew when he attended the charter school.

Even assuming that the declaration was sufficient to establish that Juror No. 4 had worked at the charter school in the past at a time when appellant attended the school, Juror No. 4 did not give an affirmative response when the court asked if any prospective

_____

[3] The People's written opposition to the petition contained the transcript of voir dire involving Juror No. 4 (originally Juror No. 31). According to the juror's answers, she was a case manager who worked for a non-profit in Watts on three different programs. None of the programs seemed to be a charter school.

10

juror knew appellant. Thus, there is no direct evidence that she recognized appellant. Appellant did not provide any details which would create an inference that she recognized him. Appellant gave no date for his attendance or Juror No. 4's employment. The more recent the dates, the more reasonable it would be to infer that Juror No. 4 must have recognized appellant. Appellant also gave no details of Juror No. 4's position at the school. If Juror No. 4 had been appellant's teacher for a school year, it could be reasonable to infer that she recognized appellant in court. If Juror No. 4 had been a security guard at the school who briefly saw a large number of students in passing, it would not be reasonable to infer that she recognized appellant. Appellant gave no hint at the basis for Juror No. 4's supposed dislike of him.

Appellant did not make a prima facie showing that would entitle him to Juror No. 4's personal information. He provided no facts to support his claim that Juror No. 4 recognized and disliked him. If his claim were well-founded, such facts would be known to him. Absent such factual support, the trial court did not abuse its discretion in treating appellant's claim as a speculative fishing expedition and denying his petition.

Appellant's counsel also filed a motion for new trial based on juror misconduct, which contained a renewed request for disclosure of Juror No. 4's personal information. No new information was contained in the motion. We see no error in the trial court's decision to deny that motion. The trial court was correct in ruling that "there's been no showing at all that the juror acted inappropriately. There's been no showing that the juror in fact did know who the defendant was."


Disposition

The judgment is affirmed.
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ARMSTRONG, Acting P. J.

We concur:


MOSK, J.                    KRIEGLER, J.

11