Filed 1/16/14  P. v. Parnell CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HEATH DERRICK PARNELL,<br><br>    Defendant and Appellant. | F064819<br><br>(Super. Ct. No. 10CM1822)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  James T. LaPorte, Judge.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Heather S. Gimle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Heath Derrick Parnell, who was wanted for a parole violation, led police officers on a dangerous high-speed chase, fired at pursuing officers, abandoned a car and stole another one, and surrendered only after he had been shot.  A jury convicted

him of four counts of attempted murder of a peace officer (Pen. Code,[1] § 217.1, subd. (b)); vehicle theft (Veh. Code, § 10851, subd. (a)); evading a pursuing peace officer (Veh. Code, § 2800.2, subd. (a)); and various additional assault and firearm-related offenses.

On appeal, Parnell contends there was insufficient evidence to support two of the attempted murder counts. He also contends that the trial court erred by failing to give a unanimity instruction sua sponte with respect to count 13, evading a pursuing peace officer. Alternatively, he claims the two offenses of evading a pursuing peace officer and vehicle theft were part of a course of conduct with a single objective, and therefore the prison term imposed for count 13 must be stayed pursuant to section 654.

Parnell raises two additional claims, which the People concede. In particular, the parties agree that four assault convictions must be reversed because they are necessarily included offenses of four other assault convictions, and a 16-month term imposed for a firearm offense must be stayed pursuant to section 654.

We agree with Parnell's alternative claim that he cannot be punished for both evading a pursuing peace officer and stealing a vehicle, and we accept the People's concessions. As a consequence, we will reverse the convictions for counts 3, 4, 9, and 10, stay the term imposed for count 13, and remand to the trial court to stay the term for either count 15 or count 16. In all other respects, we will affirm the judgment.

### *FACTUAL AND PROCEDURAL HISTORIES*

On the morning on June 29, 2010, Tulare police officer Troy Barker was on duty driving an unmarked Lincoln Navigator. The Navigator was equipped with forward-facing red and blue lights, a siren, and strobe lights. Barker observed a gray Nissan Sentra at a stop sign. As he passed by the car, the officer thought he recognized the driver as Parnell. Barker was familiar with Parnell from previous police encounters, and

---

[1]Subsequent statutory references are to the Penal Code unless otherwise specified.

he also knew from a briefing with other officers that Parnell was currently wanted for a parole violation and was suspected of some recent burglaries.

Barker was not certain the driver was Parnell, so he made a U-turn and began following the Sentra. He called in the license plate number through dispatch and was told the car was registered to an owner (not Parnell) in Paramount, California.[2] Barker advised dispatch that he was going to conduct a traffic stop and requested additional units. At that point, the Sentra accelerated and turned left into a cul-de-sac. The Sentra turned around and came out of the cul-de-sac as Barker was entering the cul-de-sac. Barker faced the driver and was able to confirm that he was Parnell. It appeared that Parnell also recognized Barker.[3] There was a passenger in the Sentra whom Barker did not recognize.

Barker followed Parnell out of the cul-de-sac and turned on his lights and siren. Parnell did not pull over and instead ran a stop sign and two red lights while driving at speeds of 50 to 55 miles per hour. He turned onto State Route 99 (SR 99) headed northbound. Barker continued to follow Parnell and radioed to dispatch that the Sentra "was not yielding to [his] lights and sirens." Tulare police officer David Hastings radioed that he was in the area of SR 99 and Prosperity Avenue and was anticipating their approach. Parnell accelerated on SR 99 up to about 75 miles per hour. As Parnell passed the onramp for Prosperity Avenue, Hastings joined the pursuit. He was wearing a standard duty police uniform and he drove a marked Tulare Police Department patrol vehicle with the lights and siren activated. Barker followed behind Hastings.

---

[2]At trial, the owner of the Nissan Sentra, Crystal Martin, testified that Parnell was her friend and she had lent her car to him the day before this incident.

[3]Barker had prior police contact with Parnell during which time they were "in the presence of each other for 30 to 45 minutes." At that time, Barker had the same Lincoln Navigator, and he wore a badge and identified himself to Parnell as a police officer.

Parnell took the Oaks Street exit off SR 99, ran a stop sign, and drove north on Oaks Street. Barker and Hastings continued to follow Parnell driving at about 65 or 70 miles per hour on the street. Hastings saw Parnell put his hand out of the car, aim a firearm toward him, and fire a number of rounds. Hastings repositioned his patrol car to the right side of the roadway to make the angle of fire more difficult for Parnell. When Hastings moved his patrol car, Barker could see the Sentra; he saw Parnell's arm out the window, his hand was up on the roof of the Sentra, and he was holding a firearm. Barker heard shots and saw puffs of dirt and debris where it appeared the bullets hit the ground. The bullets hit the ground about 15 to 20 feet in front of Barker and three to five feet from Hastings's driver-side door. The shots did not come in quick succession, and it appeared that Parnell was trying to reposition the gun for a better shot between rounds. After three or four shots were fired, Hastings and Barker backed off slightly, but they continued to follow Parnell. There was a pause in the shooting, and Parnell took his hand down from the roof of the car. Parnell repositioned his left arm and fired three or four more shots. Barker could see the muzzle flash and the recoil of the gun. He saw the impact of two of the shots as puffs of dust coming up directly in front of his vehicle.

After the second volley of shots, Parnell withdrew his hand and accelerated, reaching 70 miles per hour on a road with a speed limit of 55 miles per hour. As Parnell led the officers northbound toward the City of Visalia, Barker advised dispatch of their location and requested assistance from the California Highway Patrol (CHP) and Visalia Police Department. Soon after, Barker noticed at least two marked Visalia Police Department units and one or two CHP units. Parnell ran a red light and turned westbound onto Caldwell Avenue. Hastings and Barker continued their pursuit of Parnell with additional units behind them. Parnell again pointed the firearm back toward Hastings and Barker and "set [the gun] up on top of [the] roof holding onto it." He pulled the gun back inside the car just before reaching SR 99. Parnell then drove onto SR 99 going the wrong way, using an offramp to enter the highway and traveling northbound

4.

in the southbound lanes.  At that point, the officers stopped following Parnell because it was unsafe.

The same morning, Juanita Ramirez was in her home on a ranch in Kings County. She received a telephone call from her husband, who warned her that two men were heading toward their house and told her not to open the door for them.  He called again and told Ramirez that he had found a car by the lake which he believed was stolen and police officers were already there.  Ramirez went to a window that faced a long dirt road and saw two men running toward her house.  Two of her grandchildren were staying with her at the time, and she thought if the men thought the house was empty, they might try to break in.  So she walked out to the porch.

Ramirez stood at the back door of her house, and the two men approached.  The older and heavier of the two men asked her if she had a cell phone he could borrow because his car had broken down.  The younger, thinner man stayed by some trees on the side of the road and looked around.  Ramirez handed the man her phone; he made two calls and returned the phone.  She heard the man ask someone if they could be picked up because the car had broken down.  The man asked Ramirez if her husband was working. Ramirez said yes and told him that only she and her brother were at home.  In fact, her brother was not in the house, but Ramirez did not want the men to know she was alone. The man asked if Ramirez could give him a ride, and she told him that the starter was going out on her Suburban.  He asked if her brother could give him a ride, and she responded that her brother did not have a car.

Ramirez saw a police officer driving down the dirt road.  She went into her house, and as she tried to shut the back door, the man used his foot to prevent her from closing it.  He told her to let him in, and she said that was not going to happen.  He said, "Please let me in.  There's a warrant for my arrest.  They're going to get me."  Ramirez said no and yelled for "John."  The man removed his foot, and Ramirez shut the door and locked it.

Ramirez heard glass breaking. Through the living room window, she saw the younger, thinner man get into the passenger side of her Suburban, which was parked in the carport by the house. Then she heard the engine start and saw the Suburban moving. At trial, Ramirez identified Parnell as the older, heavier man she spoke to and his codefendant John Cotta as the younger, thinner man.

Meanwhile, Taylor Lopes, a deputy sheriff for Kings County, was on duty and in uniform. He received dispatches from the Hanford Police, Lemoore Police, and Kings County Sheriff's Department to be on the lookout for a suspect identified as Parnell, who had been involved in a high-speed pursuit and had shot at Tulare police officers. There was also a report of a car parked by a corn field, which was believed to be the car involved in the pursuit and shooting. Two men had been seen walking away from the car. Taylor Lopes responded to the area where the car was found. Several officers had already arrived. The officers received information that the suspects were walking toward a house, which was in the middle of a field. Taylor Lopes got into the vehicle of another deputy, Trevor Lopes,[4] who was driving an unmarked four-by-four truck. They, along with other officers, drove down a dirt road toward the house.

Taylor could see two suspects on the west side of the house walking around a white Suburban. The suspects got into the Suburban and drove away from the house headed east. A sergeant made an announcement from his patrol car directing the men to surrender and walk toward the officers, but they did not comply. Patrol cars surrounded the area, many of them with their lights on, and the Suburban drove in circles. Trevor activated the emergency lights and siren on his truck and followed the Suburban. The Suburban went up an embankment to a dirt road, which was a highway under construction. As the Suburban traveled westbound on the highway construction, it was

_____

[4]Taylor and Trevor Lopes are brothers and both work for the Kings County Sheriff's Department. Because the deputies share a last name, we will sometimes refer to them by their first names for brevity and to avoid confusion. We mean no disrespect.

6.

followed by another sheriff's deputy driving a marked black and white patrol car with its red lights and siren activated. Trevor followed behind the patrol car. Construction workers were forced to get out of the way. The Suburban turned northbound onto a dirt road next to a dairy. It reached a canal and turned east, and the patrol car followed. The road was very dusty and it became difficult to see. Trevor slowed down because of the dust, and Taylor could see the Suburban traveling northbound but the patrol car was no longer in pursuit.

Trevor was able to continue the pursuit and drove directly behind the Suburban along a river or canal bank for several miles at speeds ranging from 50 to 90 miles per hour. Visibility remained poor because of dust kicked up by the Suburban, but a CHP plane observing the pursuit from above radioed information to Trevor and Taylor. The CHP plane reported that the Suburban had come to a stop. Some dust cleared, and Trevor and Taylor could see the Suburban stopped at the side of the canal bank.

Trevor stopped his truck about 50 to 70 yards behind the Suburban, and Taylor immediately got out of the truck. Taylor saw a black handgun coming out of the passenger window pointed directly at him and Trevor. Taylor announced, "Gun, gun, gun," and fired two or three rounds from his Colt M-4 rifle at the person holding the gun. The gun was withdrawn momentarily and then held out of the window again pointed directly toward the deputies. Taylor fired one or two rounds. Trevor, who was in the truck when he heard Taylor yelling, "Gun, gun, gun," thought he heard three gunshots that did not sound like they came from Taylor's rifle. Trevor got out of the truck and also fired at the suspect.

The rear window of the Suburban was broken out and Taylor could see the passenger reach over and hand the gun to the driver. The driver went "over the seat or through the seats" and then the gun appeared at the back window. Taylor fired two or three rounds at the person holding the gun. The person dropped down into the seat or floorboard area. Again, Taylor saw the gun come up pointed toward him and Trevor.

7.

Taylor fired a volley of three or four rounds, and the person went back down to the floorboard again. The person came up a third time with the gun pointing at the deputies, and Taylor fired a volley of two or three rounds.[5] Taylor was not aware of any shots coming from the Suburban.

At this point, most of the movement in the Suburban stopped. The passenger moved his hands, and the deputies yelled at the suspects to put their hands up and give up. The passenger put his hands up in the air and there was no gun in his hands.

Several other law enforcement officers arrived at the scene, including Tulare County parole officers. The passenger climbed out of the passenger window and, with his hands up, walked to the deputies. He said "Heath" was still in the vehicle and he had been shot. The passenger was identified at trial as codefendant Cotta. The driver did not show his hands or respond to officer commands.

Eventually, the officers established communication with Parnell, and they could see his hands near the headrest of the passenger seat. They approached the Suburban, and Taylor opened the driver side door. He saw Parnell lying down facing the back of the vehicle with a handgun under his stomach area. Taylor grabbed the gun and threw it in some weeds next to the Suburban. Parnell was removed from the Suburban and taken to the hospital. He had been shot twice in the lower back and was bleeding. An eyeglass case was found in the right rear pocket of Parnell's shorts, which contained 15, nine-millimeter rounds.

A detective with the Kings County Sherriff's Department processed the scene where the Suburban came to a stop. He retrieved a black nine-millimeter Hi-Point Firearms semiautomatic pistol from a weedy area just north of the Suburban. There was

[5]Trevor also fired at the driver. He saw movement on the driver's side, and the driver faced him with a closed fist holding an object; Trevor was not certain what the object was but believed it was a firearm. Trevor fired three or four rounds. There was a pause, and then he saw the same movement from the driver and fired another three or four rounds.

dried blood and dirt on the slide of the firearm. The safety was on, meaning it was in a position where it would not fire accidentally; a person would have to undo the safety in order to fire it. There was a cartridge in the chamber and seven additional cartridges in the magazine. Three or four officers looked for evidence in the grass and weeds for hours, but no shell casings were found matching the nine-millimeter firearm. Thirty-five spent shell casings from Taylor and Trevor's rifles were also recovered. A detective examined the deputies' rifles, counting the live rounds remaining in the magazines, and determined that Taylor fired about 22 rounds and Trevor fired about 13 rounds.

Tulare police officers later found five, nine-millimeter shell casings on Oaks Street between Oakdale and Avenue 264. The shell casings appeared to be fresh. The Tulare Police also impounded and searched the Nissan Sentra. Officers found, among other things, three large screwdrivers; a 12-gauge shotgun shell that was not fired; two bolt cutters; a rifle scope; a can of pepper spray; and mail, checks and pieces of identification that did not belong to the owner of the car or Parnell or Cotta. No nine-millimeter shell casings were found in the Sentra.

Subsequent testing showed that the firearm recovered from near the Suburban was operable. Eight cartridges could fit in the magazine, but putting in the eighth cartridge was a struggle. No usable fingerprints were found on the firearm or the magazine.

In a first-amended information, the Kings County District Attorney charged Parnell with 16 counts: (1) attempted murder of Barker, a peace officer (§ 217.1, subd. (b)); (2) attempted murder of Hastings, a peace officer (*ibid.*); (3) assault with a semiautomatic firearm upon Barker (§ 245, subd. (b)); (4) assault with a semiautomatic firearm upon Hastings (*ibid.*); (5) assault with a semiautomatic firearm upon Barker, whom Parnell knew or should have known was a peace officer engaged in the performance of his duties (§ 245, subd. (d)(2)); (6) assault with a semiautomatic firearm upon Hastings, whom Parnell knew or should have known was a peace officer engaged in the performance of his duties (*ibid.*); (7) attempted murder of Taylor, a peace officer

9.

(§ 217.1, subd. (b)); (8) attempted murder of Trevor, a peace officer (*ibid.*); (9) assault with a semiautomatic firearm upon Taylor (§ 245, subd. (b)); (10) assault with a semiautomatic firearm upon Trevor (*ibid.*); (11) assault with a semiautomatic firearm upon Taylor, whom Parnell knew or should have known was a peace officer engaged in the performance of his duties (§ 245, subd. (d)(2)); (12) assault with a semiautomatic firearm upon Trevor, whom Parnell knew or should have known was a peace officer engaged in the performance of his duties (*ibid.*); (13) driving with intent to evade a pursuing peace officer with willful or wanton disregard for the safety of persons or property (Veh. Code, § 2800.2, subd. (a)); (14) theft and unlawful driving of a 1992 Chevrolet Suburban owned by Fidel Reyes and Juanita Ramirez (Veh. Code, § 10851, subd. (a)); (15) possession of a firearm after conviction of a felony (former § 12021, subd. (a)(1));[6] (16) carrying a loaded firearm in a vehicle while in a public place (former § 12031, subd. (a)(1), see fn. 6, *ante*).

The district attorney further alleged that Parnell had a prior "strike" conviction (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)) and served six prior prison terms (§ 667.5). As to counts 1, 2, 5, 6, 7, 8, 11, and 12, it was alleged that Parnell personally and intentionally discharged a firearm (§ 12022.53, subd. (c)). As to counts 1 through 14, it was alleged that he personally used a firearm (§ 12022.5, subd. (a)).

A jury trial began on March 12, 2012. Parnell and Cotta were tried together. On March 26, 2012, the jury reached a verdict, finding Parnell guilty of all 16 counts. The jury found the firearm-enhancement allegations true, *except* that it found not true the

---

[6]Former section 12021, subdivision (a)(1), has been renumbered section 29800, subdivision (a)(1), without substantive change. (*People v. Sanders* (2012) 55 Cal.4th 731, 734, fn. 2.) Likewise, former section 12031, subdivision (a)(1), has been renumbered section 25850, subdivision (a), without substantive change. (*People v. Velasquez* (2012) 211 Cal.App.4th 1170, 1172, fn. 2.) For brevity and clarity, we will refer to sections 12021 and 12031, the statutes applicable in this case, omitting the descriptor "former."

section 12022.53, subdivision (c), allegations related to counts 7, 8, 11, and 12. In other words, the jury found beyond a reasonable doubt that Parnell used a firearm in committing the offenses related to Taylor and Trevor Lopes, but not that he personally and intentionally discharged a firearm in those offenses.

In a bifurcated proceeding, the trial court found true the allegations that Parnell had a prior strike conviction and had served five prior prison terms. (The People struck one of the six prior prison terms alleged in the first-amended information.)

On April 25, 2012, the trial court sentenced Parnell to a determinate term of 77 years, plus 120 years to life. The sentence was calculated as follows: 30 years to life (15 years to life, doubled) for each of counts 1, 2, 7, and 8, for a total of 120 years to life; eight years for count 14 (upper term of four years, doubled); 16 months (one-third of the middle term) for each of counts 13, 15, and 16; plus enhancements of five years for five prison priors for count 1, firearm enhancements of 20 years each for counts 1 and 2, and 10 years each for counts 7 and 8. The court stayed the terms for counts 3, 4, 5, 6, 9, 10, 11, and 12 pursuant to section 654.

Parnell filed a timely notice of appeal.

## *DISCUSSION*

### I.     *Sufficiency of evidence of attempted murder of Taylor Lopes and Trevor Lopes*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Parnell does not challenge his convictions for attempted murder of officers Barker and Hastings. He challenges only counts 7 and 8, asserting the prosecution presented insufficient evidence to prove that he intended to kill Taylor and Trevor Lopes or that he took a direct but ineffectual step toward fulfilling that intent.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. '"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the

11.

defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]"' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.)

Here, Parnell argues there was insufficient evidence of intent to kill because he could have fired the gun easily through the two front seats or over the top of the driver's seat had he intended to kill either of the deputies. He also argues that the fact the gun was found with the safety on shows "an intent *not* to shoot the weapon."

These arguments are better suited to a jury, but our task is not to reweigh the evidence as a trier of fact would. In this appeal, our limited task is to determine whether there was sufficient evidence for a rational jury to find that Parnell harbored the intent to kill Taylor and Trevor Lopes. We conclude there was.

The evidence showed that, earlier that morning, Parnell fired shots at two other police officers while attempting to evade them. He led many officers on a dangerous high-speed chase over two counties. He stole Ramirez's Suburban rather than surrender, and he continued to flee even when it appeared he was surrounded by law enforcement. When the Suburban came to a stop at the canal bank, Parnell did not give himself up or try to run away on foot. Instead, he stayed in the vehicle and tried to aim a fully loaded gun at the deputies who had pursued him. As the People suggest, this was evidence from which a rational jury reasonably could deduce that Parnell was desperate to evade the police and was willing to kill to avoid capture.

The People also correctly observe that there can be sufficient evidence of attempted murder where a defendant with a firearm does not fire a shot at the intended victim. In *People v. Nelson* (2011) 51 Cal.4th 198, 206 (*Nelson*), two police officers in a marked police car were following a Monte Carlo when they observed a Jeep drive through an intersection. The defendant, a passenger in the Monte Carlo, "climbed out onto the open window frame, braced his arms on the roof, and aimed a pistol at the driver

12.

of the Jeep." (*Ibid*.)  He then pointed the pistol at the police car and fired four to six shots at the officers.  (*Ibid*.)  The defendant was found guilty of attempted murder of the two police officers and the driver of the Jeep, referred to as "John Doe."  (*Id*. at p. 203.)

Our Supreme Court rejected the defendant's claim that there was insufficient evidence of intent to kill the driver of the Jeep.  The court noted that "'the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized,'" and explained that "it appeared that defendant was first trying to eliminate the threat posed by the police officers who were pursuing him, before returning his attention to Doe, the attempted murder victim." (*Nelson*, *supra*, 51 Cal.4th at pp. 212-213.)  The court concluded, "Simply pointing his gun at Doe under these circumstances is sufficient to support a finding of attempted murder." (*Id*. at p. 212.)

Here, Parnell previously fired at other officers who pursued him.  At the canal bank, he tried to aim his firearm toward Taylor and Trevor Lopes three times, but each time, they fired a volley of shots at him and he ducked down to avoid being hit.  Under all the circumstances, we conclude that pointing his firearm at Taylor and Trevor Lopes was sufficient to support a finding of intent to kill.[7]

The same evidence also supports a finding of a direct but ineffectual step toward accomplishing the intended killing.  As we have seen, in *Nelson*, *supra*, 51 Cal.4th at

---

[7]The fact that the firearm was found with the safety on does not change our conclusion.  The People note that there was no evidence that the safety was on when Parnell pointed the firearm at the deputies.  Parnell responds that the inference that he would engage the safety in preparation for capture "strains credulity."  We disagree.  It is not far-fetched that a person would engage the safety of a firearm before hiding it under his stomach.  In light of the other circumstances and Parnell's actions, it also would not be unreasonable to infer that Cotta or Parnell either forgot to disengage the safety or accidentally engaged it.  We also observe that Parnell or Cotta must have reloaded the firearm at some point after firing at Barker and Hastings, suggesting that Parnell anticipated he would shoot again.

page 212, pointing a gun at a driver and then shooting at police officers was sufficient to support the conviction for attempted murder of the driver. Similarly, in *People v. Ervine* (2009) 47 Cal.4th 745, 785 (*Ervine*), cited by the People, the defendant was convicted of attempted murder of three sheriff's deputies, although he did not aim or shoot at one of the deputies, Aldridge. The court affirmed the conviction for attempted murder of Aldridge, concluding that the defendant's strategy of shooting at the other two deputies "constituted not only attempted murder as to those … [deputies,] but also a direct but ineffectual act toward killing Aldridge, since the elimination of the threat from [the other deputies] would have facilitated the task of killing Aldridge." (*Id*. at p. 786.)

Parnell argues in his reply brief that *Nelson* and *Ervine* are distinguishable because, in those cases, the defendants did fire at pursuing officers. We do not find this dispositive. Those cases illustrate that a defendant can take a direct but ineffectual step toward killing an intended victim without firing at the victim when the circumstances suggest intent to kill. In the present case, when Parnell first pointed his firearm toward Taylor and Trevor Lopes, they immediately fired at him. Yet, he brought his firearm up two more times and pointed it toward them. A rational jury could infer that Parnell was trying to position his firearm to get a good shot at Taylor and Trevor Lopes, and he was only stopped from shooting because the deputies fired on him immediately each time they saw the firearm. Under these circumstances, pointing the firearm at the deputies was a direct but ineffectual act toward killing them.

Finally, Parnell further asserts, "If the simple act of pointing a gun in someone's direction, without more, was sufficient to prove intent to kill, virtually every assault with a firearm … [citation] or even brandishing a weapon in a hostile manner [citations] automatically could be transformed into an attempted murder conviction." Given the events that led to the confrontation at the canal bank, we do not share Parnell's concern that affirming his attempted murders convictions would mean any assault with a deadly weapon could lead to an attempted murder charge. As we have described, Parnell did

14.

much more than the simple act of pointing a gun toward Taylor and Trevor Lopes, and the jury properly could take into account the surrounding circumstances in determining whether he was guilty of attempted murder.

## II.    *Assault convictions*

Parnell was convicted of counts 3, 4, 9, and 10, assault with a semiautomatic firearm (§ 245, subd. (b)), along with counts 5, 6, 11, and 12, assault with a semiautomatic firearm on a peace officer engaged in his duties (§ 245, subd. (d)(2)).  He contends, and the People concede, that counts 3, 4, 9, and 10 must be reversed because the offenses are necessarily included offenses of counts 5, 6, 11, and 12.  We agree.

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct."  (*People v. Reed* (2006) 38 Cal.4th 1224, 1226.)  There is, however, a judicially created exception to this general rule, which prohibits multiple convictions based on necessarily included offenses.  (*Id.* at p. 1227.)  In deciding whether multiple convictions are permitted, we look only at the statutory elements of the offenses.  (*Id.* at p. 1229.)

Section 245, subdivision (b), provides that "[a]ny person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison for three, six, or nine years."  Section 245, subdivision (d)(2), provides that "[a]ny person who commits an assault upon the person of a peace officer or firefighter with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for five, seven, or nine years."

Assault with a semiautomatic firearm in violation of section 245, subdivision (b), is a necessarily included offense of assault with a semiautomatic firearm upon a peace officer in violation of section 245, subdivision (d)(2).  As a result, Parnell cannot be

15.

convicted of both offenses. We reverse the convictions for the lesser offense, counts 3, 4, 9, and 10.

## III. *Unanimity instruction*

In count 13, Parnell was charged with a violation of Vehicle Code section 2800.2, which makes it a crime to drive with a willful or wanton disregard for the safety of persons or property while attempting to evade a pursing officer in violation section 2800.1. (Veh. Code, § 2800.2, subd. (a).) Vehicle Code section 2800.1, in turn, applies to any person who operates a motor vehicle with the intent to evade or flee from a pursuing peace officer's motor vehicle if the following conditions exist:

> "(1) The peace officer's motor vehicle is exhibiting at least one lighted red lamp visible from the front and the person either sees or reasonably should have seen the lamp.

> "(2) The peace officer's motor vehicle is sounding a siren as may be reasonably necessary.

> "(3) The peace officer's motor vehicle is distinctively marked.

> "(4) The peace officer's motor vehicle is operated by a peace officer, … and that peace officer is wearing a distinctive uniform."

Parnell does not challenge the instructions given to the jury regarding the elements of the offense of count 13. Rather, he argues that the evidence shows two discrete evasions: First, he drove a borrowed Nissan Sentra on the streets and highway while fleeing from Barker, Hastings, and other officers, and second, he drove a stolen Suburban through fields and on dirt roads attempting to elude Kings County Sheriff's deputies. Therefore, Parnell claims, the trial court was required to give the jury a unanimity instruction specifically regarding count 13.

As a preliminary matter, we reject the People's contention that Parnell forfeited this claim because he failed to request an instruction on unanimity, and the instructions given were a correct statement of the law. When the evidence suggests more than one discrete crime, "either the prosecution must elect among the crimes or the court must

16.

require the jury to agree on the same criminal act." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).)  In such cases, the trial court must give a unanimity instruction, even without a defense request.  (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 569.)  Accordingly, we address Parnell's claim.

The "requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.'" (*Russo*, *supra*, 25 Cal.4th at p. 1132.)  For example, in *People v. Diedrich* (1982) 31 Cal.3d 263, 280, the defendant was convicted of one count of bribery for the period of January to April 1973, but the evidence suggested two distinct instances of bribery during that time period.  Our Supreme Court found that the trial court's error in refusing the defendant's requested unanimity instruction was prejudicial.  The court observed that the defendant's defenses to the two discrete acts of bribery differed; he denied the first act occurred (questioning the witness's credibility) but attempted to explain the second act.  (*Id*. at pp. 282-283.)  Thus, "some of the jurors may have believed the defendant guilty of one of the acts of bribery while other jurors believed him guilty of the other, resulting in no unanimous verdict that he was guilty of any specific bribe."  (*Russo*, *supra*, at p. 1132 [describing its rationale for finding reversible error in *Diedrich*, *supra*].)

As Parnell acknowledges, however, "a unanimity instruction is not required where the criminal acts are so closely connected as to form a single transaction or where the offense itself consists of a continuing course of conduct."  (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 631.)  "The 'continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them."  (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100.)

Here, the People, at least, viewed Parnell's conduct as a single continuous offense of evasion.  In arguing a motion related to venue (which is not an issue on appeal), the prosecutor told the court:

17.

"[T]he reason that this happened at all was because of [Parnell and Cotta's] attempt to evade the police officers. [¶] So they, in order to effectuate their goal, which the original goal wasn't necessarily to wake up that morning and kill police officers, it was because they wanted to get away. So in order to do that they fired the weapons at the police officer[s].

"They continued to flee those police officers and they continued to flee into Kings County. [¶] They abandoned the vehicle and the witnesses say that they ran to the house, so there's no break in the fleeing part. [¶] [T]hen they continue to flee after they get into Kings County by stealing another vehicle."

In her closing statement, Parnell's attorney offered no defense for Parnell's conduct in evading officers Barker and Hastings. She argued only that Parnell did not intend to kill the officers, and his actions, including firing a gun at them, showed an intent to get the officers "to back off and to get away." She also told the jury Parnell's lack of intent was demonstrated when he drove the Suburban in circles after stealing it from Ramirez. If Parnell had intended to kill police officers, she argued, "[H]e could have easily just rushed into that parade of law enforcement officers," but his intent was to get away. In defense to all the counts related to Taylor and Trevor Lopes, Parnell's attorney suggested that the deputies used excessive or unreasonable force by shooting 35 rounds at the Suburban. She argued that this defense applied to counts 7 through 13, but her inclusion of count 13 appears to have been a mistake. Alleged excessive force by the deputies *after* Parnell stopped driving would not negate the unlawfulness of his prior conduct of driving recklessly to evade peace officers. (See *Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 899 [where defendant is lawfully arrested and resists arrest, "'subsequent use of excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of the criminal defendant's attempt to resist it'"].) The jury rejected this defense in any event.

In addition, the parties stipulated that three or more traffic violations, each with a minimum traffic violation point, were committed "during the pursuit on June 29th, 2010." By so stipulating, Parnell conceded that he was driving with willful or wanton

18.

disregard for safety of persons or property. (Veh. Code, § 2800.2, subd. (b) [defining "willful or wanton disregard for the safety of persons or property" to include three or more violations that are assigned traffic violation point count].)

Because Parnell's evasion of pursuing peace officers was a continuous course of conduct, and he offered essentially no defense for any of his conduct while driving either vehicle, we conclude that no unanimity instruction was needed in this case.

Further, even assuming the trial court should have given a unanimity instruction sua sponte, there was no prejudice. Parnell argues it is not unreasonable to believe some of the jurors determined that Parnell was guilty of evasion based on his conduct in the Sentra but *not* based on his conduct in the Suburban, while other jurors determined that he was guilty of evasion based on his conduct in the Suburban but *not* based on his conduct in the Sentra. We disagree that this is a reasonable possibility. Parnell suggests that some of the jurors may have found that Parnell did not see Hastings' red lamp during the pursuit. This suggestion is based on his assertion that Hastings' patrol car was offset several feet to the right of the Sentra during the pursuit. But Hastings testified that he repositioned his car to the right of Parnell's car only after Parnell fired at him. Moreover, Parnell argued at trial that he fired his weapon at Hastings and Barker only so he could get away from them, implicitly acknowledging that he was aware of Hastings' pursuit of him.

Parnell next suggests that, because of the dirt kicked up behind the Suburban, he may not have seen the lights of the marked patrol car that followed him on the highway construction. But witnesses mentioned that visibility became a problem when Parnell turned onto the dirt road at a dairy, not during the earlier pursuit on the highway construction. This argument also ignores the evidence that Parnell had driven in circles apparently looking for a way to evade the surrounding patrol cars, some with lights on. In sum, the evidence of evasion in the Sentra and the Suburban was overwhelming and Parnell offered essentially no defense. As a result, it is not reasonably probable that a

juror would have determined that Parnell was guilty of evasion with respect to his driving one vehicle but not the other.

## IV. *Evading a pursuing peace officer and vehicle theft*

Parnell argues that, if count 13 comprises his entire course of conduct—from evading Barker and Hastings in Tulare while driving the Sentra until he came to a stop in the stolen Suburban in Kings County—then count 14, vehicle theft, must be considered part of the same transaction, and, therefore, he can be punished only once pursuant to section 654.

Section 654, subdivision (a), provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

"Few if any crimes, however, are the result of a single physical act. 'Section 654 has been applied not only where there was but one "act" in the ordinary sense … but also where a course of conduct violated more than one statute and the problem was whether it comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654.' [Citation.]" (*Neal v. State* (1960) 55 Cal.2d 11, 19 (*Neal*), disapproved on another point in *People v. Correa* (2012) 54 Cal.4th 331, 334 (*Correa*).) "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal, supra,* at p. 19.)

Whether a defendant harbors a single objective or more than one is a factual determination for the trial court. (*People v. Saffle* (1992) 4 Cal.App.4th 434, 438; *People v. Liu* (1996) 46 Cal.App.4th 1119, 1135-1136.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on

appeal if it is supported by substantial evidence." (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

Parnell argues that the offenses of evading pursuing peace officers and stealing the Suburban were incident to one objective, namely avoiding capture by the police. Parnell points out that the prosecutor agreed. At trial, the prosecutor argued that all of Parnell's actions, including stealing the Suburban, were related to his objective of getting away. In his rebuttal statement, the prosecutor argued that the jury could find that Parnell used a firearm in committing the vehicle theft (count 14) because that offense continued as he fled from the pursuing deputies (count 13). The prosecutor told the jury: "Just because they took the car away from [Ramirez] and didn't point the gun at her at that point, they did use that weapon during the pursuit .… [¶] … [¶] … When they stopped that vehicle and pointed the weapon at the officers, that's use of a weapon. They were using that weapon for multiple reasons. *Their ultimate goal, of course, was to get away. That's why they stole that car.*" (Italics added.)

On appeal, the People argue that Parnell harbored two separate criminal objectives in committing vehicle theft and evading pursuing peace officers because the theft of the Suburban was complete upon Parnell driving it away, and "[t]he only intent required for that offense was the intent to deprive the owner of the use of the vehicle." We are not persuaded that this is sufficient to show separate objectives. In *Neal*, *supra*, 55 Cal.2d at page 18, for example, the defendant was convicted of two counts of attempted murder and one count of arson based on his act of throwing gasoline in the bedroom of the victims and igniting it. The court held that section 654 applied and the defendant could not be punished for both arson and attempted murder "since the arson was merely incidental to the primary objective of killing [the intended victims] .…" (*Neal, supra,* at p. 20.) In *People v. Latimer* (1993) 5 Cal.4th 1203, 1205 (*Latimer*), the defendant kidnapped his victim, drove her to the desert, and raped her twice. The court held that the defendant could not be punished separately for kidnapping and rape because "the

21.

evidence [did] not suggest any intent or objective behind the kidnapping other than to facilitate the rapes." (*Id*. at p. 1216.)

In this case, the evidence does not suggest any objective for committing count 13 (evading pursuing peace officers) and count 14 (stealing the Suburban) other than Parnell's "ultimate objective" of avoiding capture by the police. Consequently, he cannot be punished more than once for these two offenses,[8] and the term for the lesser punishment, count 13, must be stayed. (*People v. Beamon* (1973) 8 Cal.3d 625, 639-640.)

## V.     *Firearm offenses*

Parnell received separate, consecutive 16-month terms for count 15, possession of a firearm by a felon ( § 12021, subd. (a)(1)), and count 16, carrying a loaded firearm in a public place (§ 12031, subd. (a)(1)). The parties agree that one of the terms must be stayed.

In *People v. Jones* (2012) 54 Cal.4th 350, 352, the defendant was found with a loaded revolver that was not registered to him, and as a result, a jury convicted him of three offenses: (1) possession of a firearm by a felon; (2) carrying a readily accessible concealed and unregistered firearm; and (3) carrying an unregistered loaded firearm in public. The trial court imposed a prison term of three years for each conviction. Our Supreme Court reversed, concluding that the defendant could be punished only once pursuant to section 654 because his three convictions were based on a single act. (*Jones, supra,* at p. 360.)

---

[8]We recognize that this result does not fulfill the purpose of section 654, which is to ensure that a defendant's punishment is commensurate with his culpability. (*Correa, supra*, 54 Cal.4th at p. 341.) The California Supreme Court, however, has observed more than once that the *Neal* test does not ensure commensurate punishment, but the court has not overruled it. (See *Correa, supra,* at p. 341; *Latimer*, *supra*, 5 Cal.4th at p. 1211 ["A person who commits separate, factually distinct, crimes, even with only one ultimate intent and objective, is more culpable than the person who commits only one crime in pursuit of the same intent and objective."].)

Similarly, in this case, Parnell may be punished only once for his act of possessing a loaded nine-millimeter semiautomatic pistol.  Because counts 15 and 16 carry the same term, rather than remand to the trial court with directions to stay one of the counts, we will order a stay of the 16-month term for count 16.  (Cf. *People v. Alford* (2010) 180 Cal.App.4th 1463, 1473 [where trial court imposed unauthorized sentence, rather than remand for new sentencing hearing that would not change defendant's actual prison time, appellate court imposed lawful sentence].)

## *DISPOSITION*

The convictions for counts 3, 4, 9, and 10, assault with a semiautomatic firearm, are reversed.  The 16-month terms imposed for count 13, evading a pursuing peace officer, and count 16, carrying a loaded firearm in a public place, are stayed.  In all other respects, the judgment is affirmed.

_____
Oakley, J.*

WE CONCUR:


_____
Gomes, Acting P.J.


_____
Peña, J.

---

*Judge of the Superior Court of Madera County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.