Filed 1/30/14  P. v. Dalton CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALVIN HENRY DALTON,<br><br>    Defendant and Appellant. | F063443<br><br>(Super. Ct. No. F11901198)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Gary R. Orozco, Judge.

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### *INTRODUCTION*

In March 2011, defendant Alvin Dalton shot his next door neighbor, Danetta H., and her two teenage children, Dazhane H. and Dezmon H., after intervening in a physical altercation involving defendant's girlfriend, Lora White.  As a result of the shooting, Danetta died from a gunshot wound to the head, Dazhane suffered serious injuries requiring surgery, and Dezmon suffered superficial injuries.

After defendant's first trial ended in a mistrial, a second jury convicted him of one count of second degree murder (Pen. Code,[1] § 187; count 1) and two counts of unpremeditated attempted murder (§§ 187, 664; counts 2 & 3).  The jury found true the allegations that defendant personally used a handgun in the commission of each count (§ 12022.5, subd. (a)) and that he intentionally discharged a firearm in the commission of each count, causing death or great bodily injury in counts 1 and 2 (§ 12022.53, subds. (c); count 3, (d); counts 1 & 2).  The jury also found true the allegation that defendant inflicted great bodily injury in the commission of count 2 (§ 12022.7, subd. (a).)  Defendant was sentenced to an aggregate term of 83 years to life.

On appeal, defendant contends:  (1) the prosecutor committed prejudicial misconduct in closing argument by misstating the law regarding heat of passion; (2) the trial court erred by failing to instruct the jury that the enhancement allegations required proof of the union of act and intent; (3) the trial court erred in imposing a $296 probation report fee without first making a determination of defendant's ability to pay; and (4) the trial court erred in imposing a $10,000 restitution fine.  Defendant also raises ineffective assistance of counsel claims in connection with each of his contentions.  We affirm.

### *FACTS*

On March 2, 2011, around 11:30 a.m., Danetta and Dazhane were walking home from a nearby store when Lora started spraying them with mace and another strong-

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

2.

smelling substance. Dazhane reacted by throwing Gatorade bottles and a water bottle towards Lora, and Danetta sprayed Lora with a mixture of water and insect spray.

Lora went inside her apartment and shortly remerged carrying a pot of steaming hot water. Lora ran towards Danetta and poured the water on her. Lora then hit Danetta multiple times with the pot. Dazhane ran over and grabbed Lora by the hair and hit Lora multiple times in the head.

Defendant, who had been outside fixing the lock on his door, went to grab Dazhane and pull her off Lora. As he pulled Dazhane away from Danetta and Lora, defendant said, "Let it be a one-on-one fight." Dazhane continued to hit and kick defendant as he moved her away from Danetta and Lora who were now both on the ground.

Dazhane was able to get away from defendant and called out for her brother, Dezmon. A few seconds later, Dezmon ran out of their apartment and tried to pull Lora off Danetta. In the meantime, defendant punched Dazhane in the face and she fell to the ground. After defendant punched Dazhane, Dezmon asked, "You just going to hit my sister?" Defendant replied, "yes."

Dezmon pushed defendant and punched him in the face. Defendant said, "Oh, you're going to hit me, you're going to hit me?" Then defendant said, "Fuck this shit" and pulled out a gun. After firing one shot into the air, defendant pointed the gun at Danetta and shot her two to three times. After Danetta fell to the ground, defendant pointed the gun at Dazhane and shot her twice. Defendant then pointed the gun at Dezmon and fired two shots.

Dezmon started walking towards defendant and said, "You shot my mom" and "You killed my mom." Defendant said "yes" to each statement. Dezmon became angry, grabbed defendant's arm, and started wrestling with defendant standing up. As they were wrestling, defendant touched Dezmon's chest with the gun and Dezmon heard a click.

3.

Lora came up next to them and asked defendant to give her the gun. Defendant handed Lora the gun and let go of Dezmon. Defendant then went into his apartment.

### *The defense*

Defendant described living next door to Danetta as "constant terrorism." Defendant explained that Danetta had threatened him and his personal property many times, and had vandalized his patio, car, and truck.

On the night before the shooting, defendant came home to find his security screen door covered with a "sludge material" including pasta. Lora had to let him in because he could not get his key in the lock. Defendant got three pots of hot water and took them outside to clean the door.

Around 11:00 p.m., Danetta came out and said, "um-hum, you're going to be cleaning all night" and "[m]e and my homeboys, we're going to jack you—you and your car tonight," referring to the Strothers Boys gang. Dazhane was standing next to Danetta when she made this threat. Defendant took it to be a credible threat because Danetta had carried out all her past threats.

After Danetta threatened him, defendant immediately went inside his home and armed himself. He then went back outside and threw hot water on the security screen door. It took him about 30 minutes to clean the door. Defendant also called the police that night. He estimated that there had been 50 such incidents in the past six months where the police had been called.

The next morning, defendant went outside to clean the lock on the security screen door. Dazhane tried to follow Lora inside their apartment, but defendant stopped her. He then turned his attention back to cleaning the lock. Next defendant heard Danetta and Dazhane cussing and yelling at Lora. He turned around and saw Danetta and Lora "tangled" on the ground, and saw Dazhane kicking and punching Lora in the head. Defendant dropped what he was doing and ran over and pulled Dazhane off of Lora.

4.

Dazhane punched defendant in the face, kicked him in the legs and groin area, and tried to bite him in the chest.

Defendant then saw Dezmon run over to Lora and start pulling her hair and hitting her. Defendant ran over to protect Lora.[2] Defendant saw Dezmon reach into his left pocket. As defendant was looking down, Dezmon punched him. Defendant then reached for his gun. Defendant explained he reached for his gun because he was in fear for his life based on the threat Danetta had made to him the previous night. Defendant reiterated that "every time she would make a threat, she would follow through with it."

According to defendant, before he reached for his gun, all three family members—Danetta, Dazhane, and Dezmon—were hitting and kicking him. Defendant estimated he was hit five to six times and kicked three or four times. When defendant pulled out his gun, Danetta and Dazhane were standing facing him and Dezmon was behind him. Defendant fired his gun because he was in fear for his life and was trying to escape to his apartment.

## DISCUSSION

### I. Prosecutorial Misconduct

Defendant claims the prosecutor prejudicially misstated the law regarding heat of passion during closing argument. Alternatively, defendant argues that, to the extent his claim was forfeited, his trial counsel provided ineffective assistance.

We conclude defendant forfeited his claim of prosecutorial misconduct. "When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal. [Citation.] [¶] Defendant made no objection

---

[2] Defendant claimed he had never seen Dezmon before and did not recognize him at the time of the incident. Dezmon, however, testified he and his family had lived next door to defendant and Lora for three years and, although he never spoke to defendant, he often saw defendant coming and going from his apartment.

5.

to the prosecutor's remarks and thus [forfeited] his claim." (*People v. Morales* (2001) 25 Cal.4th 34, 43-44.)

Defendant cites the following statement by the prosecutor as objectionable: "So I guess, again, ask yourself: The fact that Dezmon took a swing at him, is that sufficient provocation that a reasonable person would be provoked to pulling out a gun and firing at Danetta, and then at Dazhane, and then Dezmon? Again, the evidence proves that it was not sufficient provocation."

Defendant contends the same type of argument was deemed improper in *People v. Najera* (2006) 138 Cal.App.4th 212. *Najera* explained that with the defense of heat of passion, "[t]he focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Id.* at p. 223.)

Defendant is correct that the prosecutor's hypothetical question regarding whether "a reasonable person would be provoked to pulling out a gun and firing" suggests an incorrect test for determining whether defendant acted in the heat of passion. It asks how a reasonable person would have acted in defendant's position. "[P]rovocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran* (2013) 56 Cal.4th 935, 949, original italics.) Here, the prosecutor's statements effectively "suggest[ed] that the jury should consider the ordinary person's conduct and whether such a person would kill.… [T]his was not the correct standard." (*Id.* at p. 954, fn. omitted.)

The question becomes whether defendant's trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's statement. The burden is on defendant to establish ineffective assistance by a preponderance of the evidence. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.) To do so, a defendant "must show both that trial

counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-696.)

On direct appeal, as here, this burden can be stringent. When the record on appeal ""'"sheds no light on why counsel acted or failed to act in the manner challenged[,] ... unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," *the claim on appeal must be rejected*.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267, italics added; *People v. Jones* (2003) 29 Cal.4th 1229, 1254 [ineffective assistance claim properly resolved on direct appeal only where record affirmatively discloses no rational tactical purpose for counsel's actions].)

Our Supreme Court has cautioned that, if not for this standard, "appellate courts would become engaged 'in the perilous process of second-guessing.' [Citation.] Reversals would be ordered unnecessarily in cases where there were, in fact, good reasons for the aspect of counsel's representation under attack. Indeed, such reasons might lead a new defense counsel on retrial to do exactly what the original counsel did, making manifest the waste of judicial resources caused by reversal on an incomplete record." (*People v. Pope* (1979) 23 Cal.3d 412, 426, disapproved on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1031, fn. 10.)

Defendant cannot meet his burden to establish ineffective assistance because the record is silent as to why his trial counsel did not object to the complained-of remarks by the prosecutor. The failure to object to evidence or argument "'rarely constitutes constitutionally ineffective legal representation ....' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 252; see also *People v. Ghent* (1987) 43 Cal.3d 739, 772-773 [rejecting contention counsel's failure to object during prosecutor's closing argument

7.

amounted to ineffective assistance because counsel "may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"]; *People v. Beagle* (1972) 6 Cal.3d 441, 458, superseded by statute on other grounds as stated in *People v. Rogers* (1985) 173 Cal.App.3d 205, 208-209 [failure to make certain objections to evidence ordinarily within realm of trial tactics over which court will not engage in "judicial hindsight"]; *People v. Zimmerman* (1980) 102 Cal.App.3d 647, 658 [failure to object to evidence ordinarily "held insufficient to establish an unconstitutional impairment of the right to effective counsel"].)

## II. *Instructions on Union of Act and Intent and Firearm Discharge Enhancements*

Next, defendant contends the trial court erred by failing to instruct the jury on the requirement of finding a union of act and intent as it related to the section 12022.53 enhancements.[3] Defendant argues he did not forfeit this claim because the error affects his substantial rights. Alternatively, he argues his trial counsel rendered ineffective assistance by failing to object or request modification to the allegedly incomplete instructions.

In determining whether error has been committed in giving or not giving jury instructions, an appellate court must consider the instructions as a whole and assume jurors are intelligent persons, capable of understanding and correlating all instructions that are given. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) "Instructions

---

[3] In his opening brief, defendant appears to argue that a union of act and intent was required for all the enhancements. However, in his reply brief, defendant only addresses the enhancements for the intentional discharge of a firearm (§ 12022.53 subds. (c) & (d)). He does not refute respondent's argument that the personal firearm use enhancement (§ 12022.5, subd. (a)) and great bodily injury enhancement (§ 12022.7, subd. (a)) did not require a union of act and intent. We agree with respondent. (See *People v. Poroj* (2010) 190 Cal.App.4th 165, 173 ["section 12022.7, subdivision (a) is not required to contain, and by its terms does not contain, an intent element in addition to the general or specific intent element of the underlying felony or attempted felony to which it applies"].)

should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." (*People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.)

Here, the trial court informed the jury: "The *crimes charged* in this case require proof of the union, or joint operation, of act and wrongful intent." (CALCRIM No. 251, italics added.) The section 12022.53 enhancement instructions clearly referred to the enhancements as being part of the allegations in the substantive counts. For example, the jury was told: "If you find the defendant guilty of the *crimes charged* in counts 1 and 2, you must then decide whether, for each crime, the People have proved the additional allegation*s* that the defendant personally and intentionally discharged a firearm during those crimes and, if so, whether the defendant's act caused great bodily injury or death."[4] (CALCRIM No. 3150, italics added.) Thus, the jury would have understood the union of act and intent requirement applicable to the "crimes charged" (CALCRIM No. 251) applied equally to the enhancements alleged in each count. Although it would be helpful to include language that explicitly referred to accompanying enhancements, we see no error in the instructions given here.

Because the trial court's instructions were not erroneous, we reject defendant's related ineffective assistance claim based on his trial counsel's failure to object or request modification. It is well settled that trial counsel is not required to make tactical decisions, undertake futile acts, or file meritless motions simply to withstand later claims of ineffective assistance. (*People v. Anderson* (2001) 25 Cal.4th 543, 587; *People v. Hines* (1997) 15 Cal.4th 997, 1038, fn. 5.)

### III. *Probation Report Fee*

---

**4** Likewise, the jury was instructed: "If you find the defendant guilty of the *crime charged* in Count[] 3, you must then decide whether the People have proved the additional allegation that the defendant personally and intentionally discharged a firearm during that offense." (CALCRIM No. 3148, italics added.)

9.

Defendant contends there was insufficient evidence he could afford to pay the $296 probation report fee imposed by the trial court. Alternatively, defendant argues that, to the extent the issue is forfeited, his trial counsel provided ineffective assistance.

The probation report fee was based on section 1203.1b, which authorizes the recoupment of certain costs incurred for the preparation of presentence investigations and reports on the defendant's amenability to probation. (See *People v. Valtakis* (2003) 105 Cal.App.4th 1066, 1070 (*Valtakis*).) Section 1203.1b, subdivision (b) provides in pertinent part: "The [trial] court shall order the defendant to pay the reasonable costs if it determines that the defendant has the ability to pay those costs based on the report of the probation officer, or his or her authorized representative."

We conclude defendant forfeited the issue by not objecting at sentencing. (*Valtakis, supra,* 105 Cal.App.4th at pp. 1071-1072 [§ 1203.1b probation fee].) In *People v. McCullough* (2013) 56 Cal.4th 589 (*McCullough*), our Supreme Court recently held that the defendant's failure to object to the imposition of a jail booking fee (Gov. Code, § 29550.2) forfeited the claim that he lacked the ability to pay the fee. The court concluded that the defendant's financial ability to pay the fee was a question of fact, not law. (*McCullough, supra,* at p. 597.) "Defendant may not 'transform … a factual claim into a legal one by asserting the record's deficiency as a legal error.' [Citation.] By 'failing to object on the basis of his [ability] to pay,' defendant forfeits both his claim of factual error and the dependent claim challenging 'the adequacy of the record on that point.' [Citations.] … [B]ecause a court's imposition of a booking fee is confined to factual determinations, a defendant who fails to challenge the sufficiency of the evidence at the proceeding when the fee is imposed may not raise the challenge on appeal." (*Ibid.*)

The same rationale applies to presentence probation report fee. Before sentencing, defendant was in possession of the probation officer's report, which recommended that the court impose a $296 probation report fee pursuant to section 1203.1b. When the

court sentenced defendant and imposed the fee, defendant did not object to the fee and thus challenges to the fee are forfeited on appeal.

Moreover, defendant cannot meet his burden on his ineffective assistance of counsel claim because the record is silent as to why his trial counsel did not object to the probation report fee. (See *Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.) Counsel may have known facts outside the record that would have supported an ability-to-pay finding.

## IV. *Restitution Fine*

Finally, defendant challenges the trial court's imposition of a $10,000 restitution fine based on a failure to consider defendant's ability to pay. Defendant relies on *Southern Union Co. v. United States* (2012) 567 U.S. ___ [132 S.Ct. 2344] (*Southern Union*), to argue that the determination of facts affecting the restitution fine amount should have been decided by a jury. Alternatively, defendant again argues that, to the extent his claims are forfeited, his trial counsel provided ineffective assistance.

At the time of defendant's sentencing, section 1202.4, subdivision (b) required the trial court to impose a restitution fine between $240 and $10,000[5] in every felony case unless "compelling and extraordinary reasons" exist for not doing so. (§ 1202.4, subd. (b).) While a defendant's inability to pay can be considered when increasing a fine beyond the statutory minimum, it "shall not be considered a compelling and extraordinary reason not to impose a restitution fine." (§ 1202.4, subd. (c).) When determining the amount of the fine, the court must consider "any relevant factors, including, but not limited to, the defendant's inability to pay, the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses [tangible and intangible] as a result of the crime, and the number of victims involved in

---

[5] As of January 1, 2014, section 1202.4, subdivision (b)(1) calls for the imposition of a felony restitution fine between $300 and $10,000. (§ 1202.4, subd. (b)(1).)

the crime." (§ 1202.4, subd. (d).)  The court need not conduct a separate hearing to determine the fine, nor make express findings regarding the factors considered in determining the fine.  (*Ibid*.)  Indeed, the court may determine the amount of the fine by formula.  (§ 1202.4, subd. (b)(2).)**6**

Although defendant forfeited most claims on this point by failing to object during sentencing (see *People v. Nelson* (2011) 51 Cal.4th 198, 227 (*Nelson*)), we will consider defendant's claim based on *Southern Union* because that case was decided after his sentencing hearing.  (*Southern Union*, *supra*, 567 U.S. ___ [132 S.Ct. 2344].)

In *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), the United States Supreme Court held that a jury must decide beyond a reasonable doubt any fact that increases a criminal penalty beyond a statutory maximum.  (*Id.* at p. 490.)  In *Southern Union*, the Court extended the *Apprendi* rule to monetary fines.  (*Southern Union*, *supra*, 567 U.S. at pp. _____, [132 S.Ct. at pp. 2352, 2357].)  Defendant argues the jury should have decided the amount of the restitution fine because it increased his sentence. Defendant's argument was recently addressed and rejected in *People v. Kramis* (2012) 209 Cal.App.4th 346, 351-352 (*Kramis*).  *Kramis* explained that *Apprendi* and *Southern Union* do not apply unless a court imposes a penalty that *exceeds* a statutory range. (*Kramis,* at p. 351.)  Because the trial judge imposed a $10,000 fine in *Kramis*, the court held the fine was within the statutory range, did not implicate *Apprendi* or *Southern Union*, and therefore did not need to be decided by a jury.  (*Kramis,* at pp. 351-352.) Like the fine in *Kramis*, the trial court here exercised discretion within the statutory range and imposed a $10,000 restitution fine.  Although the fine constitutes the statutory

---

**6**     Section 1202.4, subdivision (b)(2) allows the court to set the fine by multiplying the minimum fine under section 1202.4, subdivision (b)(1), times the number of years of imprisonment, times the number of convicted felony counts.  (§ 1202.4, subd. (b)(2).)

maximum, it does not exceed the maximum and *Southern Union* therefore does not apply.

We need not determine whether trial counsel's failure to object to the restitution fine was defective because even assuming counsel's performance was deficient, defendant cannot demonstrate prejudice. Had trial counsel preserved an objection to the amount of the restitution fine, the amount of the fine would be subject to an abuse of discretion standard on appeal. (*Nelson, supra*, 51 Cal.4th at p. 227.) In reviewing the amount of the restitution fine, numerous factors in section 1202.4, subdivision (d) support the trial court's decision. The crimes in this case—second degree murder and attempted murder—were extremely serious. Defendant committed the crimes by intentionally firing a handgun at three unarmed victims. The surviving victims are minors who lost their mother as a result of defendant's violent actions. In light of all the circumstances in this case, it was not an abuse of discretion for the trial court to impose a $10,000 restitution fine. Thus, defendant has not met his burden to show ineffective assistance of counsel.

### *DISPOSITION*

The judgment is affirmed.

_____
HILL, P. J.

WE CONCUR:


_____
GOMES, J.


_____
POOCHIGIAN, J.

13.